Erik B. Ryberg (Arizona Bar No. 023809)
312 S. Convent Ave.
Tucson, AZ 85701
Tel: (520) 622-3333
Fax: (520) 622-2406
ryberg@seanet.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT and THE CENTER FOR BIOLOGICAL DIVERSITY<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE<br><br>Defendant. | No.<br><br>COMPLAINT<br><br>(Declaratory and Injunctive Relief) |

## INTRODUCTION

1. This action challenges seventeen separate Forest Service actions that granted livestock grazing leases to private ranchers on Arizona's national forests without first undertaking appropriate public review in an environmental assessment or environmental impact statement. That public review is required by the National Environmental Policy Act, or "NEPA," for all federal actions that may have a significant effect on the environment, but the United States Forest Service neglected to conduct it.

2. Commercial livestock grazing, particularly in Arizona's extremely arid and fragile desert environment, adversely impacts ecological communities such as aquatic and riparian areas, meadows, upland aspen stands, grass and forb communities,

and desert landscapes, all of which are important fish and wildlife habitat. Cows and sheep trample and eat vegetation, compact soils and cause erosion, degrade water quality, reduce the quantity of water available to natural desert systems, and spread non-native weeds and plants that can have devastating effects on the natural environment and the habitats they invade. They also alter the plant communities on the areas they graze by eating grass that would otherwise out-compete trees like junipers, which can lead to widespread biological transformation of rangelands. When livestock degrade these habitats, they impair the ecological functioning or survival of many fish, wildlife, and plant species.

3.      Because grazing can cause so many adverse environmental impacts, NEPA normally requires the Forest Service to complete either an environmental assessment ("EA") or an environmental impact statement ("EIS") before issuing or renewing ten-year grazing permits, such as those at issue here. This review provides for a thorough examination of the impacts of livestock grazing on public land resources as well as an opportunity for the public to comment on and appeal grazing decisions.[1]

4.      Under some circumstances, the Forest Service may proceed with grazing permit renewal without conducting this environmental review. Congress passed an appropriations rider in 2005 that allows the Forest Service to reauthorize grazing on public lands leases without preparing an EA or EIS, but only so long as the reauthorized permit (1) does not alter the management plan currently in place; (2) the Forest Service has monitoring data that show the grazing is meeting or satisfactorily moving toward applicable ecological objectives; (3) the Forest Service has demonstrated there will be no significant impacts to certain special resources such as imperiled species, wetlands, and wilderness areas.[2]

5.      Unfortunately, here in Arizona the Forest Service has repeatedly and

---

[1] Most Forest Service actions that undergo NEPA review can be administratively appealed. 36 CFR 215.
[2] The exact text of the appropriations rider states that the action can be excluded from review if: "(1) the decision continues current grazing management; (2) monitoring indicates that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary; and (3) the decision is consistent with agency policy concerning extraordinary circumstances."

improperly used this 2005 appropriations rider as a blank check to reauthorize grazing permits even in cases where the three necessary objectives have not been met. The plaintiffs in this case have therefore challenged 17 decisions involving four of Arizona's six National Forests.

6.     In these 17 decisions there are all manner of violations of the appropriations rider. There are grazing reauthorizations that proceeded despite an increase in grazing, there are those that proceeded even when monitoring data showed that ecological benchmarks were neither being met nor satisfactorily approached, and there are authorizations that have proceeded even though the Forest Service has acknowledged the presence of special resources such as endangered, threatened, or sensitive fish, wildlife, and plant species, but failed to demonstrate that commercial livestock grazing is not harming these resources.

7.     Further, for some of the grazing allotments at issue here, the Forest Service either has never conducted any site-specific environmental analysis under NEPA, or has not done so in many years. By using the appropriations rider to quickly renew grazing permits, the Forest Service has been able to escape in-depth environmental analysis and public comment on (or administrative appeal of) its decisions on these allotments, many of which are thousands of acres in size and suffer from significant documented degradation. Because these decisions do not meet the requirement of the rider, and will have significant adverse effects on the environment, the Forest Service has violated NEPA by failing to conduct the appropriate environmental review.

8.     The plaintiffs thus seek judicial review and relief reversing and setting aside the challenged decisions, and further declaratory and injunctive relief to prevent the Forest Service from continuing to exempt from NEPA decisions that do not meet the requirements of the 2005 appropriations rider.

JURISDICTION and VENUE

9.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331
(federal question jurisdiction), because this action arises under the laws of the United
States, including the National Environmental Policy Act, 42 U.S.C. §  4321 et. seq., the
Administrative Procedure Act, 5 U.S.C. § 701 et. seq., the Declaratory Judgment Act,
28 U.S.C. § 2201 et. seq., the FY 2005 Consolidated Appropriations Act, Pub. L. No.
108-447, Sec. 339; and the Equal Access to Justice Act, 28 U.S.C. § 2214 et. seq.  An
actual, justiciable controversy now exists between the Plaintiffs and the Defendant, and
the requested relief is proper under 28 U.S.C. §§ 2201 et. seq. and 5 U.S.C. §§ 701-706.

10.     This Court may grant the relief requested under 28 U.S.C. §§ 2201 and
2202 (declaratory and injunctive relief) and 5 U.S.C. § 701-706 (APA).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a
substantial part of the events giving rise to the Plaintiff's claims occurred in this
district, Defendants have offices and manage lands within the district, and because the
Plaintiffs maintain offices in this district.  The projects occur in and were authorized in
this judicial district.


PARTIES

12.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit
membership organization headquartered at the Greenfire Preserve in Custer County,
Idaho, with offices and staff in Salmon, Hailey, McCall and Boise, Idaho; and also in
Arizona, California, Montana, Wyoming, and Utah. WWP is dedicated to protecting
and conserving the public lands and natural resources of watersheds in the American
West.  WWP, as an organization and on behalf of its more than 1,400 members, is
concerned with and active in seeking to protect and improve the wildlife habitat, soil
productivity, riparian areas, water quality, and other natural resources and ecological
values throughout the West, including Arizona.  WWP is also active in monitoring

ecological conditions in Arizona, including the national forestlands where these projects occur; in reviewing and commenting upon agency grazing and other resource decisions; in advocating for the protection of wild populations of desert wildlife and range quality; and in publicizing the ecological effects of grazing in this region.

13.     WWP has actively participated in management of livestock grazing in the National Forests of Arizona through letters, comments, field trips, and administrative proceedings including public comment and administrative appeal of many Forest Service grazing-related projects.  WWP has taken many opportunities to express its concerns over management of the Arizona's public lands.  WWP, and its staff and members, use and enjoy the wildlife, public lands, and other natural resources managed by the U.S. Forest Service for many health, recreational, scientific, spiritual, educational, aesthetic, and other purposes.  WWP and its staff and members pursue activities such as hiking, wildlife viewing, biological and botanical research, photography, and spiritual renewal on the subject BLM lands.  WWP and its staff and members also derive personal enjoyment, educational, recreational, and aesthetic benefits from observing desert wildlife in their native habitat, and observing desert landscapes in a natural, undegraded condition.  Livestock grazing that degrades this fragile ecosystem and threatens animal populations, soil conditions, and vegetation, impairs the use and enjoyment of this public landscape by WWP staff and members.

14.     WWP staff, members, and supporters will continue to visit the subject lands managed by the Forest Service in the future for many purposes such as hiking, wildlife viewing, photography, scientific study, spiritual renewal, and to otherwise enjoy the natural scenery and beauty of Arizona's public lands.  WWP, both organizationally and on behalf of its staff, members, and supporters, has an interest in the preservation and protection of the ecology of these public lands, which interest is directly harmed by Defendant's actions and inactions challenged herein.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("CBD") is a non-profit corporation dedicated to the preservation, protection, and restoration of

biodiversity, native species, ecosystems, and public lands throughout the United States. CBD has offices across the United States, including Arizona. CBD uses science, law, advocacy, and public outreach and education to protect the lands, water, and climate that native species need to survive in order to protect biodiversity, particularly those species on the brink of extinction. CBD actively engages in activities throughout the western United States to protect native species and their habitat from livestock grazing. CBD staff and individual members use and enjoy national forests across the West, including the forests at issue here, for hiking, biking, nature and wildlife viewing, photography, spiritual renewal, solitude, and other recreational, educational, aesthetic, and spiritual purposes. Livestock grazing that harms native species and their habitat impairs the use and enjoyment of these forests by CBD staff and its members.

16.     Plaintiff CBD, both organizationally and on behalf of their staff, members, and supporters, have deep and long-standing interests in the preservation and protection of western national forests and their resources, which interests are directly harmed by Defendant's actions challenged here. CBD has been involved in many public and private efforts to protect Arizona's public lands and their resources from the harmful impacts of livestock grazing and to preserve or restore their special resources, including endangered, threatened, and sensitive species. CBD's staff, members, and supporters will continue to visit these national forests in the future to hike, hunt, fish, camp, observe wildlife, take photographs and otherwise enjoy their natural and scenic beauty and biodiversity.

17.     The above-described conservation, recreational, scientific, and aesthetic interests of plaintiffs and their staff, members and supporters have been, are being, and, unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendant's violations of law. Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate.

18.     Defendant UNITED STATES FOREST SERVICE is an agency or instrumentality of the United States, and is charged with managing the public lands and

resources of the National Forests, in accordance and compliance with federal laws and regulations.

## LEGAL BACKGROUND

### A.  The National Environmental Policy Act

19.     As our nation's basic environmental charter, NEPA requires federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including preparing a detailed EIS for all major Federal actions that may significantly affect the quality of the human environment.  An EIS must consider a range of reasonable alternative actions and assess site specific and cumulative impacts of these actions.  42. U.S.C. §4332(C).  Cumulative impacts are the past, present, and reasonably foreseeable future actions that must be assessed in combination with the proposed action, to determine the potential for significant impacts to the environment.  40 C.F.R. § 1508.7.

20.     Under federal regulations, agencies may prepare an EA to assist in the NEPA process.  40 C.F.R. § 1508.9.  An EA is a more limited review of environmental factors associated with a  federal action, performed to assist the agency in determining whether and EIS is warranted.

21.     NEPA also provides for public input into the decison-making process, and Forest Service regulations allow the public to appeal its final EA or EIS decisions.  40 C.F.R. §§ 1503.1, 1506.6; 36 C.F.R. Part 215.  As noted by the Supreme Court, NEPA requires an agency to (1) take a  "hard look" a the environmental consequences of its proposed action before proceeding with implementation of the action, and (2) encourage public involvement in the decsion-making process.  *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 350 (1989).

22.     The issuance or renewal of a federal livestock grazing permit is a major federal action that triggers NEPA review.  See, e.g., *Idaho Watersheds Project v. Hahn*, 307 F.3d 815 (9th Cir. 2002), *Natural Resources Defense Council v. Morton*, 388

F.Supp. 829 (D.D.C. 1974), aff'd without opinion, 527 F.2d 1386 (D.C. Cir. 1976).

**B.      The 2005 Appropriations Rider**

23.      In the fiscal year 2005 appropriations bill, Congress passed a rider that allowed the Forest Service categorically to exclude grazing reauthorizations in fiscal years 2005 through 2007 from documentation in an EA or EIS if: "(1) the decision continues current grazing management; (2) monitoring indicates that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary; and (3) the decision is consistent with agency policy concerning extraordinary circumstances."  FY 2005 Consolidated Appropriations Act, Sec. 339 (Pub. L. 108-447).  The total number of allotments authorized under this rider nationwide could not exceed 900.

24.      The Forest Service used the rider to exclude hundreds of permit renewals from environmental review under either and EA or an EIS, including dozens in the last month before the rider expired.  But, even with this last rush of excluded renewals, the Forest Service did not reach its target of 900 allotments, and Congress extended the rider for fiscal year 2008.  FY 2008 Consolidated Appropriations Act, Sec 421 (Pub. L. 110-161).

25.      Under the rider's first requirement, the categorically excluded decision must continue "current grazing management."  It cannot authorize more grazing or grazing under different circumstances than what is presently taking place.  The Forest Service's internal guidelines interpret "current grazing management" to mean the management that has been implemented over the past three to five years.  Forest Service Handbook 2209.13.

26.      The rider's second requirement ensures that a decision will be categorically excluded only when the Forest Service has monitoring information showing that current grazing management is meeting, or satisfactorily moving toward, land and resource management plan objectives.  Each forest or group of forests has its

own Land and Resource Management Plan ("Forest Plan"), which sets forth desired conditions, goals, standards and guidelines for various resources on the forest such as fish and wildlife, vegetation, soils, water, recreation and cultural resources.

27.     The rider's third requirement is that the categorically excluded decision must comply with Forest Service policy on extraordinary circumstances, which is found in the Forest Service Handbook, Chapter 190.15.30.3.2.  To determine whether extraordinary circumstances exist, the Forest Service must first determine whether certain resource conditions are present in the action area.  According to Forest Service regulations, those resource conditions are: a) federally listed threatened or endangered species or designated critical habitat, species proposed for federal listing or proposed critical habitat, or Forest Service sensitive species; b) flood plains, wetlands, or municipal watersheds; c) congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas; d) inventoried roadless areas; e)research natural areas; f) American Indian and Alaska native religious or cultural sites; or g) archaeological sites, or historic properties or areas.  Next the Forest Service must assess the "degree of potential effect of the proposed action on these resource conditions" to determine whether extraordinary circumstances exist.  The Forest Service must demonstrate that there will be no significant effect on any of these special resource conditions to avoid preparing an EA or EIS.

### C.     The Administrative Procedure Act.

28.     The Administrative Procedure Act, or "APA," provides for judicial review of agency actions, and calls for the reviewing court to hold unlawful and set aside actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or that exceed statutory authority; or that were made without observance of procedure required by law.  5 U.S.C. § 706(2).

29.     As demonstrated below, the Forest Service has violated Section 706(2) of the APA by issuing the decisions challenged herein as categorical exclusions, because

they do not meet all of the requirements for exclusion set forth in the 2005
appropriations rider.

## FACTUAL BACKGROUND

### A.    The Impacts of Livestock Grazing.

30.    Livestock grazing by cattle and sheep can dramatically alter native
ecological communities and damage habitat for a multitude of fish, wildlife, and plant
species.  Grazing harms both upland and riparian communities[3] by degrading
vegetation, soils, and streams.

Impacts on upland communities.

31.    Upland plant communities impacted by grazing include meadows, aspen
stands, grasslands, tall forb communities (forbs are non-woody broad-leaved flowering
plants – commonly called wild flowers), sagebrush communities, and forests with
undergrowths of grass, forbs, and shrubs.  Livestock consume large quantities of
vegetation, negatively effecting not only plant growth, but also species diversity and
composition, the seral state[4] and vigor of plants, and the prevalence of weeds.
Trampling of vegetation adds to the adverse impacts of grazing when livestock crush
and displace plants and damage woody shrubs.

32.    One of the primary adverse effects of livestock grazing is its alteration of
plant diversity and composition.  Cows and sheep generally prefer to eat native grass
and forb species.  By selectively grazing these plants and eating their seed heads and
flowers, livestock reduce seed production and regeneration of native plants.  In turn,
non-native invasive species quickly take root and spread in their place.  Many
rangelands in the western United States—including many that are the subject of this

---

3 Upland communities are dry plant communities that are not adjacent to water sources. Riparian communities are
areas adjacent to water sources such as rivers, streams, ponds, lakes, seeps, springs, bogs, fens, or wet meadows,
which normally contain lush, highly productive vegetation.

4 The seral state of a plant refers to its successional status—*i.e.*, whether it is an early colonizer of an area that was
recently disturbed, or a "climax" plant that appears when a community has matured.

lawsuit—are now in poor ecological condition, because livestock grazing has eliminated the natural and healthy diversity and abundance of native grasses, forbs, and shrubs, allowing invasive species to take over.

33.     Invasive species, such as cheatgrass, Kentucky bluegrass, crested wheatgrass, scotch broom, and other exotic weeds are usually of lower ecological value to watershed health and wildlife.  Furthermore, invasive plants can lead to increased use of herbicides, forest health problems, and altered fire cycles.  One dramatic example is the expansion of cheatgrass across the West, which has increased wildfire frequency and intensity.

34.     Livestock also trample and break the branches off woody shrubs, reducing their vigor and eliminating canopy cover on which many wildlife species depend.  Heavy browse of young shrubs and saplings prevents regeneration and recruitment of new woody shrubs, aspen, and cottonwood, leaving only decadent stands of old shrubs and trees.[5]
Further, grazing reduces the density and vigor of grasses and forbs in forested areas. By removing the herbaceous vegetation understory[6] that normally outcompetes tree seedlings, grazing leads to thick stands of small trees such as junipers that increase the risk of wildfire.

35.     Grazing also greatly impacts soil conditions, significantly altering biological communities and the hydrology of watersheds.  First, livestock deplete vegetation, leaving the ground bare.  Then they disturb the bare ground with their hooves, creating a bed ready-made for the growth of quickly-spreading noxious weeds and other invasive species, the seeds of which livestock carry in their hooves, guts, or hair.

36.     Second, increased bare ground, combined with livestock disturbance and destruction of biological soil crusts, leads to erosion when loose soil is transported by wind, or by overland water flows during rain events or snowmelt.  This erosion causes

---

5 A shrub or tree is decadent when it is in a state of decline.

6 Herbaceous vegetation are plants lacking a woody stem.

rills (small rivulets in the soil), gullies (channels in the soil formed by moving water), and pedestalling of plants (soil loss around the base of plants, making them appear elevated).

37.     Further, livestock trampling compacts soils, reducing water infiltration and increasing surface water run-off that carries away the topsoil no longer protected by soil crusts.  Often this topsoil ends up as sediment in streams.

38.     When less water permeates the soil due to compaction, water storage capacity is reduced, which can be particularly stressful to plants and animals in times of drought.  Soils dry out faster, impairing plant productivity.  Later in the summer, less groundwater is available, causing stream flows to diminish or dry up completely.

*Impacts to riparian communities*

39.     Although riparian areas, such as perennial streams, seeps, springs, intermittent streams, wet meadows, bogs and fens, make up only a tiny percentage of the rangelands of the West, they provide important habitat for fish, wildlife, and sensitive plant species.  Riparian areas enjoy greater biodiversity than any other plant community because of their rich, moist soils and multi-layered vegetation. Unfortunately, because riparian areas provide water, food, and shade, they also disproportionately attract livestock, especially cattle, which then damage these areas.

40.     As with upland communities, livestock deplete vegetation and alter plant diversity and composition in riparian communities by selectively grazing native vegetation and allowing less-desirable invasive species to spread.  Livestock also impact the survival and the age-diversity of trees and woody shrubs in riparian areas, by browsing saplings and young shrubs.  Furthermore, grazing and trampling increase bare ground and compact wet soils, causing these sites to become drier, which in turn reduces plant productivity and converts species from lush riparian vegetation to dry-site vegetation.

41.     The depletion of native riparian vegetation and compaction of wet soils

also reduces water infiltration, which decreases the water storage capacity of wet meadows, fens, springs and seeps, and streamside riparian areas.  This loss of infiltration can significantly degrade the hydrology of a watershed, creating higher peak flows of surface run-off that scour stream channels and erode streambanks during snowmelt and rain storms.  At the same time, the loss of groundwater lowers the water table, which leads to dried up streams later in the season.

42.     The Forest Service's increasing reliance on water developments, which pipe water from natural springs into distant troughs for livestock to drink, lowers the water table even more.  The drying out of riparian areas increases as livestock grazing impacts are added to the effects of global warming, seriously altering the hydrologic regime of our western watersheds.

43.     Livestock also directly degrade water quality when they walk in streams and graze and trample streambanks.  Urine and manure deposited directly into streams or carried into streams through run-off increase the bacterial and nutrient contents in the water, which in turn reduces dissolved oxygen.  When livestock walk in streams, they also stir up the sediment of the stream bed, creating higher turbidity levels.

44.     Trampling and grazing of streambanks lead to erosion and increased sediment.  Livestock destabilize banks when they trample them or eat riparian vegetation, which typically have deep, stabilizing root systems.  Denuded and destabilized banks easily erode and deposit sediment into stream channels.  Grazing of riparian vegetation also reduces its effectiveness at trapping the sediment carried in overland run-off.  Increased sediment leads to shallower and warmer streams, and reduces the frequency and quality of pools, while bank trampling and sloughing[7] reduce undercut banks and meanders, creating wider, straighter streams with higher water velocity.

*Impacts on fish, wildlife and plant habitat*

---

7 Bank sloughing occurs when a part of the streambank breaks away and "sloughs" off, due to livestock walking along the edge of the bank.  These chunks of streambank then erode into the stream channel.

45.     The adverse effects of livestock grazing on upland and riparian communities described above have significant ramifications for the fish, wildlife, and plant species that inhabit these communities.

46.     Aspen stands, which often grow on the edge of meadows, are second only to riparian areas in their native biodiversity.  These stands provide habitat for migratory and resident birds, including sensitive species like goshawks.  Livestock browse and kill young aspen stems, preventing them from regenerating or becoming overstory and causing significant decline of existing aspen stands.  In addition, when livestock graze the grass and forb understory and disturb the soil in these stands, conifer encroachment increases.  Conifer stands have replaced aspen stands all across the West, causing a loss of important habitat for many wildlife species.

47.     The grazing of understory plants in forested areas, as well as in meadows and grasslands, also impairs the habitat of small mammals and invertebrates.  These species require tall grasses and forbs for protection and food, but livestock grazing reduces the value of these plants to wildlife and often converts native plant species to less valuable invasive species.  Livestock also trample the nests and young of small mammals and compact the soil, making it more difficult for burrowing animals to survive.  Population declines of small mammals and invertebrates caused by livestock, in turn, adversely impact predatory species such as goshawks, great gray owls, and bats, all of which are now in decline.

48.     Similarly, livestock grazing of tall forbs impacts the species that rely on these plants.  Many forbs produce flowers that provide food for pollinators like hummingbirds and bees.  When livestock eat these forbs, it eliminates pollinators' food source and impairs the productivity and reproduction of more forbs.  As the native forbs disappear, they are replaced by plants that do not support pollinators.

These impacts often occur near range "improvements," such as fences, corrals, or water developments that provide water from springs or stock ponds.  The disturbance caused by livestock is intense even a mile or more from these structures, interrupting and

fragmenting habitat for native birds and wildlife.   Fences also disrupt the migration or food search of larger mammals, like deer, elk, and pronghorn.

49.     As noted above, riparian areas provide the greatest biodiversity of any community, but receive disproportionately higher adverse impacts from livestock grazing.  Impacts to streams and their channels adversely affect fish, especially those species that require clean, cold water for survival like most native trout species.  Many species of Arizona's native fish are at risk because of habitat degradation.  Livestock degrade fish habitat when they trample spawning beds, reduce streamside vegetative cover and shade, and cause increases of sediment and other pollutants, leading to higher water temperatures, algae blooms, and fewer pools and undercut banks that provide cover and refuge for fish.

50.     Aquatic macroinvertebrates (insects), many of which also require cold water with little sediment or pollutants, suffer from these same impacts.  Moreover, both aquatic and terrestrial insects rely on riparian plants for their food source.  Grazing reduces the amount and diversity of streamside vegetation, reducing this primary food source.  Loss of invertebrate abundance and diversity in turn affects fish that prey on these insects.

51.     Livestock grazing of streamside vegetation and woody shrubs also affects bird, mammal, and amphibian species.  Many birds, like the endangered willow flycatcher, and mammals such as deer and elk, rely on the complex vegetative structure of riparian areas for cover and food.  By browsing and damaging woody shrubs and trees, particularly willow and cottonwood, livestock reduce the amount and quality of cover and nesting sites for these birds and mammals.  Beaver cannot create water-conserving dams when livestock deplete their food source (largely willows).  The grazing and trampling of herbaceous vegetation reduces cover for amphibians, and alters the plant diversity of the area by removing native species and replacing them with less valuable invasive species.

52.     Other wetlands, such as seeps, springs, fens, and wet meadows, provide

specialized riparian habitat for many different plants and animals. Wetlands are habitat for aquatic species, a water source for terrestrial animals, and a source of food and cover for birds, reptiles, amphibians, and mammals. Seeps and springs often support unique plant and animal species. In fact, approximately 200 endemic vertebrate and invertebrate species as well as hundreds of plants, many of which are designated as threatened or sensitive, occupy only these habitats.

53.     Because wetlands are drying out or degraded, many of the plants, amphibians, and macroinvertebrates that rely on them are now in decline. For example, large numbers of frogs and toads are now listed as threatened or sensitive. Species that depend on these habitats at certain times of the year are also adversely impacted, such as migratory songbirds.

54.     Livestock using these highly critical wetland areas not only step on nests and small animals, they also destroy habitat by trampling and grazing the vegetation, compacting and drying out soils, and impairing water infiltration, all of which reduces water storage and plant productivity and converts wetlands into drier sites.

55.     Even fencing off springs and pumping water to upland troughs adversely impacts wildlife because these water developments prevent large animals from accessing the vegetation and water around springs, and remove water that would normally keep the soils moist, retain high plant productivity, and later contribute to stream flows.

56.     Finally, grazing even harms large wildlife in various ways. Livestock compete with deer and elk for forage. In addition, when livestock move to riparian areas and aspen stands to graze, they often displace deer and elk which use these areas as their primary cover.

### Impacts on cultural resources

57.     National forest lands in the western United States contain many historic and prehistoric sites from early white settlers and Native Americans, and the Forest

Service is charged with preserving and protecting these sites. These sites consist of artifacts or structural remains from early homesteads; historic or prehistoric trails, roads, and inscriptions on trees and rocks; as well as Native American artifacts, structures, lithic scatters, and sacred sites.

58.   Livestock trample and bed down on artifacts. They also disturb and erode soil that covers artifacts, displace artifacts, and degrade sacred sites. These impacts are particularly likely in heavy use areas such as salting or bedding grounds, trailing routes, water developments, or along fencelines.

59.   In sum, livestock grazing adversely impacts our natural resources in many different ways. Yet, the Forest Service often has either never assessed these impacts, or has not done so for many years. In the meantime, numerous native fish, wildlife, and plant species have been in serious decline or face extinction, weeds have increased, riparian destruction has increased, and global warming (to which cattle contribute) grows as a threat. Now, the Forest Service is relying improperly on the 2005 appropriations rider to escape its obligation under NEPA to conduct in-depth site-specific environmental analysis and involve the public in ten-year-long grazing decisions on many allotments covering thousands of acres of public lands in California, lands that contain wilderness areas, imperiled species, key wildlife habitat, and cultural resources. In many instances these easy grazing reauthorizations do not meet the criteria of the rider and are unlawful.

**B. Overview of Violations of the 2005 Appropriations Rider**

60.   The 2005 appropriations rider contains three requirements that the Forest Service must satisfy to reauthorize grazing under a categorical exclusion ("CE"), as noted above. Instead of carefully picking grazing allotments that meet these requirements, the Forest Service is using the rider to reauthorize grazing allotments in highly sensitive areas.

61.     The agency's violations of the rider fall into several patterns described below.

*The rider's first requirement*

62.     Under the rider's first requirement, the CE decision must "continue current grazing management."  Evidently, the Forest Service has interpreted this requirement to allow it to authorize grazing at levels allowed under a previous permit even when no grazing occurred on the allotment for several years prior to the CE decision.  Not only does this interpretation contradict the plain meaning of "current grazing management," it also contradicts the Forest Service's own handbook and policy guidance, which state that current management means the management implemented over the last three to five years through Allotment Management Plans or Annual Operating Instructions.

63.     Several of the challenged CE decisions here authorize grazing on allotments where no annual grazing occurred several times within the previous five years.  By using a CE to reauthorize grazing at levels much higher than the grazing actually implemented over the last five years, the Forest Service is not continuing current grazing management.  Moreover, any up-to-date monitoring of these grazing allotments is relevant only to assess conditions when livestock use has been nonexistent or significantly less than permitted; such monitoring cannot provide meaningful data to support the level of livestock reauthorized.

64.     The Forest Service has also authorized new grazing leases under rider in cases where other important features of the management have changed, such as how or what resources get monitored, or whether that monitoring is self-reported by the rancher or conducted by Forest Service professionals.

*The rider's second requirement*

65.     The second condition of the rider is that "monitoring [must] indicate . . .

that current grazing management is meeting, or satisfactorily moving toward, objectives in the land and resource management plan." To satisfy this requirement, the Forest Service must actually have monitoring data and this data must demonstrate that the current grazing is not unduly harming resources on the grazing allotment at issue. Most of the CE decisions here violate this requirement because the Forest Service either lacks relevant monitoring data or the data show that conditions are degraded and are not getting better as a result of the current grazing levels implemented.

66.     The referenced land and resource management plan objectives come from individual or region-wide Forest Plans. These plans set forth desired conditions, goals, standards and guidelines for maintaining or restoring properly functioning ecosystems; promoting ecologically healthy and diverse vegetation, soils, water resources, and fish and wildlife habitat; and protecting species of concern and cultural resources.

67.     The monitoring information needed to demonstrate that forests are meeting or moving toward these objectives consists of information from studies of the effects of grazing on upland communities, riparian communities, and fish and wildlife habitat. This limited focus offers little or no information about the impact that grazing has on the health of rangelands and their associated wetlands, habitat, and inhabitants, and thus cannot be used to demonstrate that current grazing management is meeting or moving towards all land and resource management plan objectives.

68.     In some cases, the Forest Service has conducted the widespread monitoring necessary to assess the impact of grazing on individual allotments. But in the CE decisions challenged here, they have not.

69.     Finally, some of the Forest Service's CE decisions do not comply with the rider's second requirement because the monitoring actually shows that livestock grazing is causing serious damage. The agency has issued decisions even when its monitoring information indicates degraded conditions, excessive bare ground, noxious weeds, and damage to riparian areas caused by livestock grazing.

*The rider's third requirement*

70.     Under the rider's final requirement, the Forest Service's CE decisions must be consistent with the agency's policy on extraordinary circumstances.  As discussed above, this policy looks at whether certain resource conditions, including endangered, threatened, and sensitive species, wetlands, cultural resources, and wilderness areas, are present and the degree of potential effect on these resource conditions.

71.     Many of the allotments covered under the CE decisions contain these special resource conditions.  Yet, for the challenged decisions, rather than analyze the impact of continued grazing, the Forest Service has summarily concluded—with little or no analysis and data whatsoever—that acknowledged impacts on these special resources do not amount to extraordinary circumstances.

72.     Similarly, the Forest Service decisions frequently cite evidence that grazing is harming wetlands, cultural resources, and imperiled species.   But the decisions simply assert the unsupported conclusion that continued grazing will not have significant impacts.
Moreover, the Forest Service has completely neglected to assess the cumulative impacts of grazing other allotments in the same forest or neighboring forests.  Thus, the Forest Service's assertion that a specific grazing decision will not impact overall populations of sensitive species, or overall abundance of wetlands does not take into account the cumulative impacts of grazing authorized on additional adjacent or near-by areas.

73.     Because, in many instances, the Forest Service has not demonstrated the absence of extraordinary circumstances despite the presence of special resource conditions and yearly use of those areas by livestock, it has not complied with the rider's third requirement.

74.     The above paragraphs describe the Forest Service's general abuse of the CE rider.  Specific CE decisions challenged by Plaintiffs are described below.  These decisions authorize grazing on several different national forests in Arizona and each

violates the rider in one or more ways.

C.   **Unlawful CEs Issued In Arizona National Forests**

*The Coconino National Forest*

75.     The Coconino National Forest is about 1,865,000 acres in size and includes the areas surrounding Sedona; its headquarters is in Flagstaff.  According to the Forest Service Website, "the Coconino National Forest is one of the most diverse National Forests in the country with landscapes ranging from the famous Red Rocks of Sedona to Ponderosa Pine Forests, to alpine tundra."

The plaintiffs challenge seven grazing allotments on the Coconino National Forest.

(1)   <u>The Angell Allotment</u>

76.     This allotment covers nearly 52,000 acres.  The decision was made under the 2005 Appropriations Rider, and signed on July 25, 2006.

Use increased on the allotment after the decision was signed.  In the seven years prior to the decision, livestock were grazed from a low of 705 to a high of 2550 Animal Unit Months; the July 2006 decision authorizes 3,135 Animal Unit Months, and grazing since the permit was signed as reached this lever.

77.     Worse, the Forest Service has permitted grazing that even exceeds what is authorized by the 2006 decision, including allowing the rancher to leave his livestock on the lands through November 15 in 2010, which is fifteen days longer than the decision allows.

78.     The Angell allotment also fails to meet the rider's second requirement because areas of the allotment are in downward trend.  According to the Forest Service's analysis, there are eighteen vegetation monitoring plots on the allotment, and only five show improvement, with two showing downward trend and eleven rating "static."

79.     Almost fifteen percent of the allotment is in "impaired" condition, and of

eighteen soil monitoring plots two are "downward to static" and another two are "downward." The Forest Service identifies juniper encroachment as the cause of the decline. Juniper encroachment is caused in part by livestock grazing, because livestock eat the grasses that compete with juniper seedlings.

      (2)     The Black Bill Summit Allotment

      80.     This allotment decision was signed on June 18, 2007. The allotment does not continue current management—the rider's first requirement—because it announces that monitoring of the allotment will only occur if funding is available. It does not condition grazing on the existence of the funding needed to properly manage the allotment, but instead conditions proper management of the allotment on the existence of funding: if the Forest Service cannot afford to conduct monitoring of resource values on the allotment, grazing is explicitly permitted to continue anyway.

      81.     This feature of the analysis renders a categorical exclusion unjustified. It is impossible to categorically declare that there will be no significant impacts to a project that will be permitted to continue in the absence of otherwise required monitoring.

      (3)     The Casner Park and Kelly Seep Allotments

      82.     These allotments were signed on September 26, 2008; they cover, together, 28,047 acres. Like all other decisions included in this lawsuit, they were signed pursuant to the 2005 Appropriations Rider. They encompass habitat for the threatened Mexican spotted owl and includes lake-side riparian zones.

      83.     Not all of the Mexican spotted owl habitat has been surveyed, nor have key monitoring areas been identified and revealed to the public, as required by the Coconino Forest Plan.

      84.     The allotment does not continue current management—the rider's first requirement—because it announces that monitoring of the allotment will only occur if funding is available. It does not condition grazing on the existence of the funding needed to properly manage the allotment, but instead conditions proper management of

the allotment on the existence of funding: if the Forest Service cannot afford to conduct monitoring of resource values on the allotment, grazing is explicitly permitted to continue anyway.

85.     This feature of the analysis renders a categorical exclusion unjustified.  It is impossible to categorically declare that there will be no significant impacts to a project that will be permitted to continue in the absence of otherwise required monitoring.

(4)     The Cosnino Allotment

86.     This allotment was signed on September 26, 2008, pursuant to the 2005 Appropriations Rider.  It is 10,900 acres in size.

87.     The allotment does not continue current management—the rider's first requirement—because it announces that monitoring of the allotment will only occur if funding is available.  It does not condition grazing on the existence of the funding needed to properly manage the allotment, but instead conditions proper management of the allotment on the existence of funding: if the Forest Service cannot afford to conduct monitoring of resource values on the allotment, grazing is explicitly permitted to continue anyway.

88.     This feature of the analysis renders a categorical exclusion unjustified.  It is impossible to categorically declare that there will be no significant impacts to a project that will be permitted to continue in the absence of otherwise required monitoring.

(5)     The Slate Mountain and Wild Bill Allotments

89.     These allotments were signed in one decision, on September 17, 2007.  Slate Mountain is 46,115 acres; Wild Bill is 26,327 acres.

90.     The allotments do not continue current management—the rider's first requirement—because they announce that monitoring of the allotments will only occur if funding is available.  They do not condition grazing on the existence of the funding needed to properly manage the allotments, but instead condition proper management of

the allotments on the existence of funding: if the Forest Service cannot afford to conduct monitoring of resource values on the allotments, grazing is explicitly permitted to continue anyway.

91.    This feature of the analysis renders a categorical exclusion unjustified.  It is impossible to categorically declare that there will be no significant impacts to a project that will be permitted to continue in the absence of otherwise required monitoring.

*The Coronado National Forest*

92.    The Coronado National Forest covers 1,780,000 acres across southeastern Arizona and a small section in extreme southwestern New Mexico. Elevations range from 3000 feet to 10,720 feet, encompassing biological communities ranging from the desert floor to cold, wet mountain "sky islands."  According to the Coronado National Forest Website, the Forest supports plant communities of similar diversity as could be encountered on a vehicle trip from Canada to Mexico.

(1)    The Polecat and Oak Grove Allotments

93.    The plaintiffs challenge two grazing allotments on the Coronado National Forest: the Polecat and Oak Grove allotments, both of which were analyzed in a single decision document, signed on April 16, 2007.

94.    The grazing allotments authorize year-long livestock grazing on 2,596 acres of the Polecat allotment and 4,292 acres of the Oak Grove allotment. Importantly, only a fraction of those acres are considered to be suitable for livestock grazing: just 1,269 of the Polecat and 865 acres of the Oak Grove allotments are "suitable" acres.

95.    There is no fence to keep livestock out of the unsuitable grazing areas.

96.    Most of the allotments are within a federally-designated roadless area.

97.    The allotments encompass critical habitat for the lesser long-nosed bat, which is a threatened species.  No surveys have been conducted for the bat, nor have

studies been conducted to determine the effects livestock may have on the agaves that the bat requires to live.

98.    The Forest Service concluded that because they believe that livestock do not use the area between April 15 and June 15 when the agaves are blooming.  However the Forest Service lands are not fenced and livestock can access them all year long, and the allotment is at an elevation that would admit of livestock grazing throughout April and May.  Because there is no evidence that livestock do not impair agave production and, subsequently, the lesser long-nosed bat's habitat, and because the allotment is in a roadless area with important ecological values, an environmental assessment is the appropriate process for environmental review; a categorical exclusion is not justified and the the use of 2005 Appropriations Rider is impermissible because of the extraordinary circumstances that are present on the allotments.

99.    As a further impediment to the use of the categorical exclusion, the Coronado Forest Plan requires the agency to "Eliminate grazing from areas not capable of supporting livestock without significant detriment to range or other resources."  This action does not do so.


*The Kaibab National Forest*

100.    The Kaibab National Forest is in Northern Arizona and includes the Grand Canyon as well as grasslands and forests surrounding the Canyon.  Ito contains important habitat for antelope, Mexican spotted owls, goshawk, and many other rare and unique species.  Plaintiffs challenge three decisions on the Kaibab National Forest.

(1)    <u>The Pine Creek Allotment</u>

101.    The Pine Creek Allotment was signed, pursuant to the 2005 Appropriations Rider, on September 26, 2008.  It is 8,374 acres in size.

102.    The decision does not meet the first condition of the rider because it does not continue current management.  Starting in 2009 the Forest Service increased the permitted grazing intensity and changed its monitoring program so that the rancher is

now permitted to self-report range conditions, rather than have Forest Service professionals conduct the monitoring.

103.   The decision also violates the second condition because monitoring does not show that the landscape is moving toward objectives.  On the contrary, seven vegetation sites were monitored in 2007 and all of them were in poor condition, with two of them trending downward.  The same sites were monitored in 1983 and all sites that ranked "fair" in 1983 ranked "poor" in 2007.

104.   The decision also violates the third condition of the rider because it contains a wetland but does not offer that wetland needed protection.  In fact, a livestock tank on one end of the wetland serves to attract livestock to the area, and mitigation measures involving the wetland only come into play after damage has occurred.

(2)   The Seven C Bar Allotment

105.   This allotment was signed, pursuant to the rider, on September 26, 2008. It is just 117 acres in size and has only one long-term monitoring site, which ranked fair in 1984 and poor in 2007.  Three sites were measured during the 2007 analysis and all ranked "poor."  Bare soil on the allotment has also increased.  Because monitoring is not showing improvement, this project violates the second condition of the 2005 rider.

(3)   The Twin Tanks Allotment

106.   This allotment was signed, pursuant to the rider, on September 26, 2008. It violates the second condition of the rider because monitoring does not show improvement.  On the contrary, survey sheets completed for the analysis show that of eleven analyzed areas, only one is in "fair and stable" condition.  Two are poor and downward trending, five are poor and stable, and three are fair and downward trending.

107.   Similarly, soil monitoring shows six sites to be in downward trend, one of which is both in poor condition and getting worse.

*The Prescott National Forest*

108.    The Prescott National Forest encompasses about 1,250,000 acres surrounding Prescott, and includes rugged Sonora-desert landscapes up to higher-elevation ponderosa pine-dominated forests.  Plaintiffs challenge seven decisions on the Prescott National Forest.

(1)    The Chino Valley Allotment

109.    The Chino Valley Allotment was signed, pursuant to the rider, on September 28, 2007.  It violates the second condition of the rider because soil conditions are in unsatisfactory or impaired condition across 47 percent of the allotment, with only two of seven units exhibiting upward trends.  According to the Forest Service's specialist's report, "current management is contributing to decreased soil productivity" in approximately 31 percent of the allotment.

(2)    The Dugas Allotment

110.    The Dugas Allotment was signed on September 28, 2007.  It contains habitat for two Forest Service "sensitive" species, the lowland leopard frog and the Southwestern toad.  The Forest Service specialist's report indicates that there have been no surveys for these animals but that habitat is present and "there would be the potential of direct mortality from trampling of egg masses, tadpoles or frogs/toads by livestock."  Similar conclusions have been drawn for these species in adjacent allotments, and the cumulative impacts from widespread livestock grazing have not been evaluated.

(3)    The Rice Peak Allotment

111.    The Rice Peak Allotment was signed on September 28, 2007.  This allotment is adjacent to the Dugas Allotment and, like that allotment, does not show how populations of the lowland leopard frog and Southwestern toad will be protected. Because there are stated potential effects from the action and no data to show otherwise, a categorical exclusion is not warranted.

(4)    The Todd Allotment

112.    The Todd Allotment was signed on September 28, 2007.  This allotment

is adjacent to the Dugas and Rice Peak Allotments and, like those allotments, does not show how populations of the lowland leopard frog and Southwestern toad will be protected.  Because there are stated potential effects from the action and no data to show otherwise, a categorical exclusion is not warranted.

     (5)    The V-Bar Allotment

113.    The V-Bar Allotment was signed on September 28, 2007.  The allotment has about 7.5 miles of riparian area, of which only 2.73 miles are in proper functioning condition.  There are 2.66 miles of "non-functional" riparian and 2.0 miles of "functioning at risk" riparian areas.  The riparian condition on this allotment is particularly important because directly downstream is occupied critical habitat for the endangered Gila chub.  Tellingly, the Aquatic Species Report asks in bold, underline italics, "Does this really meet the criteria for the CE?"  There are also four sensitive species in the area that rely on functioning riparian areas: the Southwestern toad, lowland leopard frog, common black hawk, and Western yellow-billed cuckoo.

Moreover, only five of 4,677 acres were surveyed for cultural resources.  Four heritage sites were not surveyed and the specialist's report does not acknowledge that livestock grazing can have an effect on cultural sites through trampling: rather, it states that because there are no "ground disturbing" activities authorized, no further analysis is needed.

     (6)    The Yolo North Allotment

114.    The Yolo North Allotment was signed on September 28, 2007.  The Watershed Specialist's Report finds soil conditions to be unsatisfactory owing primarily to livestock grazing.  It does not contain information that would suggest whether these conditions are improving.

## FIRST CLAIM FOR RELIEF
### (FOR VIOLATIONS OF THE 2005 APPROPRIATIONS RIDER)

115.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

The Forest Service has violated section 339 of the FY 2005 Consolidated Appropriations Act, Public Law Number 108-447, by authorizing livestock grazing using categorical exclusions, where those authorizations do not meet the terms of this appropriations rider.  Such violations include, but are not limited to:

a.      Authorizing grazing that is greater than or otherwise different from current grazing management, in violation of the rider's first requirement;

b.      Authorizing grazing without having adequate monitoring information to demonstrate that current grazing management is meeting or satisfactorily moving toward Forest Plan objectives, or alternatively where monitoring information shows that current grazing management actually is not meeting or satisfactorily moving toward Forest Plan objectives, in violation of the rider's second requirement; and

c.      Authorizing grazing that is not consistent with the Forest Service's policy on extraordinary circumstances, in violation of the rider's third requirement.

116.    This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The Forest Service's violations of the 2005 appropriations rider are arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

SECOND CLAIM FOR RELIEF
(FOR VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT)

117.    Plaintiffs reallege and incorporate by reference the preceding paragraphs. The Forest Service has violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and NEPA's implementing regulations by authorizing livestock grazing without first conducting the necessary environmental analysis of the impacts of such grazing in an EA or EIS in light of the potentially significant impacts that each of the challenged CE grazing decisions will have.

118.    This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Forest Service's violations of NEPA are arbitrary, capricious, an abuse of

discretion, and not in accordance with law under the APA, which has caused or threatens serious prejudice and injury to Plaintiffs' rights and interests.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

A.      Adjudge and declare that the Defendant Forest Service has violated the 2005 appropriations rider; and reverse and set aside the grazing decisions challenged herein as being arbitrary, capricious, an abuse of discretion, and/or contrary to law, pursuant to the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.      Adjudge and declare that the Defendant Forest Service has violated NEPA; and order the Forest Service to conduct an appropriate environmental analysis in an EA or EIS for the decisions challenged herein.

C.      Enter such other declaratory relief, and temporary, preliminary, and/or permanent injunctive relief, as may be prayed for hereafter by Plaintiffs;

D.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and/or all other applicable authorities; and/or

E.      Grant such further relief as the Court deems just and proper in order to provide Plaintiffs with relief and protect the public interest.

Dated:  May 15, 2011

/s/ Erik B. Ryberg
Erik B. Ryberg
312 S. Convent Ave.
Tucson, AZ 85701
phone: (520) 622-3333
fax: (520) 622-2406
e-mail: ryberg@seanet.com
Attorney for Plaintiffs