**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Western Watersheds Project, *et al.*, | No. CV-11-08128-PCT-NVW |
| Plaintiffs, | **ORDER** |
| v. | |
| U.S. Forest Service, | |
| Defendant, | |
| and | |
| Arizona Cattle Growers' Association, *et al.*, | |
| Defendant-Intervenors. | |

## <u>TABLE OF CONTENTS</u>

I.   Introduction ................................................................................................... 1

   A.  Statutory and regulatory background ................................................ 1

   B.  The licenses in question .................................................................... 5

II.  Legal Standards ............................................................................................ 5

   A.  Appropriateness of judicial review .................................................. 5

   B.  Standard of review ............................................................................ 6

III. Analysis ........................................................................................................ 7

   A.  Challenges under only the forest-plan objectives condition ............ 8

      i.   Pine Creek Allotment (Kaibab National Forest) ................... 8

1.   Kaibab National Forest LRMP ...................................................... 8

2.   The challenge to the Pine Creek decision .................................... 9

3.   The Forest Service's decision was not arbitrary or capricious.... 9

ii.   Seven C-Bar Allotment (Kaibab National Forest) ........................... 11

1.   The challenge to the Seven C-Bar decision .............................. 11

2.   The Forest Service's decision was not arbitrary or capricious.. 12

iii.   Twin Tanks Allotment (Kaibab National Forest) ........................... 13

1.   The challenge to the Twin Tanks decision ................................ 13

2.   The Twin Tanks Decision Memo ................................................ 14

3.   The Forest Service's decision was not arbitrary or capricious.. 15

iv.   V-Bar Allotment (Prescott National Forest) ................................ 16

1.   Prescott National Forest LRMP .................................................. 16

2.   The challenge to the V-Bar grazing license .............................. 17

3.   The Forest Service's decision was not arbitrary or capricious.. 17

B.   Challenges under the extraordinary-circumstances condition ...................... 18

i.   Casner Park/Kelly Seep Allotment (Coconino National Forest) ...... 19

ii.   Cosnino Allotment (Coconino National Forest) ............................. 21

iii.   Angell Allotment (Coconino National Forest) ............................... 22

1.   Archaeological sites on the Angell Allotment ........................... 23

2.   The Forest Service's consideration of archaeological sites ....... 23

3.   The Forest Service's decision was arbitrary and capricious. .... 24

C.   Challenge to Chino Valley Allotment decision under both the forest-plan objectives and extraordinary-circumstance provisions .................................... 30

i.   The challenge under the forest-plan objectives condition fails. ........ 30

ii.   The challenge under the extraordinary-circumstance condition also fails. ......................................................................................... 31

IV.  Conclusion ........................................................................................... 32

Before the Court are Plaintiffs' Motion and Memorandum in Support of Summary Judgment (Doc. 33), Defendant's Cross-Motion for Summary Judgment and Memorandum in Support of Summary Judgment (Docs. 34, 43), Defendant-Intervenors' Motion for Summary Judgment and Memorandum in Support of Summary Judgment (Docs. 35, 41), and all responses and replies.

## I.    Introduction

### A. Statutory and regulatory background

The United States Forest Service (the "Forest Service") is charged with managing the country's national forests pursuant to the National Forest Management Act of 1976 (the "NFMA").  *See* 16 U.S.C. §§ 1600-1614.  Under the NFMA and its implementing regulations, the Forest Service must manage national forests both at the forest level and at the individual-project level.  At the forest level, the Forest Service must develop a Land and Resource Management Plan ("LRMP" or "forest plan") for each national forest.  *See* 16 U.S.C. § 1604(g)(1)-(3).  The forest plan lays out guidelines and objectives with regard to the management of the entire forest, taking into account varied environmental, economic, and other factors.  *Id.*  At the level of individual projects, the Forest Service must decide whether to approve or deny proposed actions within each national forest in a manner consistent with the direction laid out in the forest plan.  16 U.S.C. § 1604(i).  Individual projects that must be consistent with the forest plan include the distribution of commercial grazing licenses on national forest land.  *See W. Watersheds v. U.S. Forest Serv.*, No. C 08-1460 PJH, 2012 WL 1094356, at *1 (N.D. Cal. Mar. 30, 2012) (citing *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996)).

The Forest Service's individual-project-level decisions must also comply with the National Environmental Policy Act ("NEPA").  NEPA requires that a thorough environmental review precede any proposed major federal action that could have significant environmental impact.  42 U.S.C. § 4332(2)(C).  NEPA's objective, then, is to ensure that an "agency will not act on incomplete information, only to regret its decision

1

after it is too late to correct." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989)). The NEPA mandate:

> ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

To satisfy NEPA, an agency generally must prepare an in-depth environmental impact statement ("EIS") that conforms to extensive regulations regarding content, methodology, the opportunity for public comments, and more.  40 C.F.R. §§ 1502.1-1502.25.  For certain types of actions, the agency instead may prepare an environmental assessment ("EA")—"a concise public document" with sufficient analysis to determine whether an EIS is warranted.  40 C.F.R. § 1508.9(a).  When, however, the proposed agency action falls within an existing "categorical exclusion," the agency need not prepare an EIS or an EA.  40 C.F.R. § 1501.4.  A categorical exclusion is a category of actions that have been determined not to have a significant environmental impact, either individually or cumulatively.  40 C.F.R. § 1508.4.  As such, the Forest Service, acting on behalf of the Secretary of Agriculture (the "Secretary"), must prepare an EA or EIS before renewing a commercial grazing license on a federal land allotment, unless the renewal falls within a categorical exclusion.  *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 160 (D.D.C. 2002) (citing *Natural Res. Def. Council v. Morton*, 388 F. Supp. 829 (D.D.C. 1974)).

With the Fiscal Year 2005 Appropriations Act (the "Rider"), Congress expedited the process by which the Forest Service could issue commercial grazing licenses.  In response to the backlog of expiring grazing licenses, Congress established a categorical exclusion allowing the Forest Service to renew up to 900 grazing licenses without an EA or EIS, if certain conditions were satisfied, between fiscal years 2005 and 2007.  FY 2005

Appropriations Act, Pub. L. No. 108-447 § 339.  Congress later extended the Rider to fiscal year 2008.  FY 2008 Consolidated Appropriations Act, Pub. L. No. 110-161 § 421.[1]

Congress' categorical exclusion for commercial grazing licenses applied when:

> (1) the decision continue[d] current grazing management of the allotment;
>
> (2) monitoring indicate[d] that current grazing management [was] meeting, or satisfactorily moving toward, objectives in the land and resource management plan, as determined by the Secretary; and
>
> (3) the decision [was] consistent with agency policy concerning extraordinary circumstances.

FY 2005 Appropriations Act, Pub. L. No. 108-447 § 339.  Accordingly, to bypass the environmental review, the license decision first had to continue the status quo with regard to grazing (the "status-quo condition").  Second, the existing grazing-management system had to further the objectives in the forest plan for the national forest in which the allotment was located, as determined by the Secretary (the "forest-plan objectives condition").

The third and final condition required that the decision be consistent with the U.S. Forest Service's policy on extraordinary circumstances (the "extraordinary-circumstance condition").  That Forest Service policy, codified at 36 C.F.R. § 220.6, identifies resource conditions that may affect whether a proposed action, such as issuing a grazing license, warrants an EA or an EIS; these resource conditions may constitute extraordinary circumstances.  When an extraordinary circumstance is present, the categorical exclusion cannot apply.  Resource conditions that may constitute extraordinary circumstances include but are not limited to: federally listed threatened and endangered species; flood plains, wetlands, or municipal watersheds; American Indians and Alaska Native religious or cultural sites; and archaeological sites.  36 C.F.R § 220.6(b)(1).  Even if an enumerated resource condition is present, the Forest Service may be able to act through a categorical exclusion, without producing an EA or EIS.  36 C.F.R § 220.6(b)(2).  However, when an

---

[1] The licenses at issue here were authorized during the time period in which the Rider was in effect.

enumerated resource condition exists on the allotment, the Forest Service must evaluate: (1) whether the proposed action could affect the resource, and (2) the degree of any potential effect.  Forest Service Handbook (hereinafter "FSH"), 1909.15, §§ 31.2-31.3 (2010).[2]  If the proposed action could affect the resource, the degree of the effect determines whether an extraordinary circumstance exists.  36 C.F.R § 220.6(b)(2).  If the proposed action could have a significant effect on a resource condition, then there is an extraordinary circumstance, the categorical exclusion does not apply, and the Forest Service must conduct an EA or EIS.  FSH, 1909.15, §§ 31.2-31.3 (2010); *see also W. Watersheds*, 2012 WL 1094356, at *13.  Further, the plain text of the Forest Service's policy states that if the agency is uncertain as to whether the action could have a significant impact on a resource condition, then the Forest Service cannot use the categorical exclusion.  *See* FSH, 1909.15, §§ 31.2-31.3 (2010) ("If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA."); *see also* 36 C.F.R. § 220.6(c).

If a proposed grazing license satisfied these three conditions—(1) the status-quo condition, (2) the forest-plan objectives condition, and (3) the extraordinary-circumstance condition—and the Forest Service was certain that its actions would not have significant environmental effects, then the Forest Service had to categorically exclude the license from extended environmental review.  FY 2005 Appropriations Act, Pub. L. No. 108-447 § 339; FSH, 1909.15, §§ 31.2-31.3 (2010).  If any of the three conditions was not satisfied, then the Forest Service could not renew a grazing license without further environmental study.

---

[2]  The Forest Service Handbooks provide additional information and instructions regarding Forest Service policy.  They are a source of guidance and instruction for the implementation of objectives, policies, legal mandates, and the like; along with the Forest Service Manual, the Handbooks serve as the "primary source of administrative direction to Forest Service employees."  *Forest Service Directives*, United States Forest Service, http://www.fs.fed.us/im/directives/ (last visited Nov. 16, 2012).

4

### B.  The licenses in question

At issue here are eight commercial grazing licenses for allotments in national forests in Arizona.   The Forest Service granted each ten-year license through the categorical exclusion and without an EA or EIS.  The licenses are for: the (1) Angell, (2) Casner Park/Kelly Seep, and (3) Cosnino Allotments on the Coconino National Forest; the (4) Pine Creek, (5) Seven C-Bar, and (6) Twin Tanks Allotments on the Kaibab National Forest; and the (7) Chino Valley and (8) V-Bar Allotments on the Prescott National Forest.  The Forest Service issued a decision memorandum for each license, and the decisions were not subject to administrative appeal under 36 C.F.R. § 215.12(f). Plaintiffs have challenged the Forest Service's decisions that licenses for four of these allotments—Pine Creek, Seven C-Bar, and Twin Tanks on the Kaibab National Forest, and V-Bar on the Prescott National Forest—satisfy the forest-plan objectives condition of the Rider.  Plaintiffs have challenged the decisions that licenses for three allotments, Angell, Casner Park/Kelly Seep, and Cosnino on the Coconino National Forest, satisfy the extraordinary-circumstance condition of the Rider.  Finally, Plaintiffs assert that the decision regarding the Chino Valley Allotment on the Prescott National Forest fails to satisfy both the forest-plan objectives condition and the extraordinary-circumstance condition.  Plaintiffs do not suggest that any of the licenses fails to meet the Rider's status-quo condition.

Plaintiffs request that the Court direct the Forest Service to prepare an environmental assessment or an environmental impact statement for each grazing license. The existing licenses would remain operative during the environmental-review process. Defendant and Defendant-Intervenors ask the Court to uphold the decisions to apply the categorical exclusion and thereby to issue the grazing licenses.

## II.   Legal Standards

### A.  Appropriateness of judicial review

Judicial review in this case is appropriate pursuant to the Administrative Procedure Act ("APA").  The APA allows for judicial review when a party seeks to have

5

1    a court "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C.

2    § 706(1); *see also Dombeck*, 222 F.3d at 560 (determining that an action to compel the

3    Forest Service to produce a supplemental EIS arose under § 706(1) of the APA).

4        **B.  Standard of review**

5        Under the APA, a reviewing court must hold unlawful and set aside agency action,

6    findings,  and  conclusions  that  are  "arbitrary,  capricious,  an  abuse  of  discretion,  or

7    otherwise not in accordance with law."[3]  5 U.S.C. § 706(2)(A).  This standard applies

8    when  a  court  reviews  an  agency's  decision  that  its  action  falls  within  a  categorical

9    exclusion,  such  as  that  established  by  the  Rider.  *Alaska  Ctr.  for  the  Env't  v.  U.S.  Forest

10   Serv.*,  189 F.3d 851, 857 (9th Cir. 1999) (citing *Bicycle Trails Council of Marin v.

11   Babbitt*,  82 F.3d 1445, 1456 (9th Cir. 1996)).  An agency determination is arbitrary and

12   capricious if the agency:

13
14               relied  on  factors  which  Congress  has  not  intended  it  to
                 consider, entirely failed to consider an important aspect of the
                 problem,  offered  an  explanation  for  its  decision  that  runs
15               counter  to  the  evidence  before  the  agency,  or  is  so
                 implausible  that  it  could  not  be  ascribed  to  a  difference  in
                 view or the product of agency expertise.
16
     *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996)
17
     (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43
18
     (1983)).   The  reviewing  court  evaluates  "whether  the  decision  was  based  on  a
19
     consideration  of  the  relevant  factors  and  whether  there  has  been  a  clear  error  of
20
21   judgment."   *Marsh  v.  Or.  Natural  Res.  Council*,  490 U.S. 360, 378 (1989) (citation

22   [3] While the pending motions have been framed as motions for summary judgment under
     Rule 56 of the Federal Rules of Civil Procedure, this action arises out of section 706 the
23   Administrative Procedure Act, 5 U.S.C. § 706, and is subject to the standard of review set
     forth in that section.  "[I]n a case involving review of a final agency action under the
24   [APA] . . . the standard set forth in Rule 56(c) does not apply because of the limited role
     of a court in reviewing the administrative record.  In this context, summary judgment
25   becomes the mechanism for deciding, as a matter of law, whether the agency action is
     supported by the administrative record and otherwise consistent with the APA standard of
26   review."  *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d
     1077, 1083-84 (E.D. Cal. 2011) (citations and internal quotation marks omitted).  *See
27   also Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985) ("[W]here . . . the
     district court is reviewing a decision of an administrative agency . . . summary judgment
28   is an appropriate mechanism for deciding the legal question of whether the agency could
     reasonably have found the facts as it did.")

                                                   6

omitted).

The arbitrary and capricious standard is "highly deferential . . . [and requires] affirming the agency action if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).  An agency decision may display "less than ideal clarity" but must be upheld if "the agency's path can reasonably be discerned."  *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  Moreover, "[d]eference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters."  *United States v. Alpine Land & Reservoir, Co.*, 887 F.2d 207, 213 (9th Cir. 1989).

Still, the court's review is "searching and careful," *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (citation omitted), and the agency must adequately explain its reasoning for the decision to pass muster, *Alaska Ctr.*, 189 F.3d at 859.  A court will defer to an agency's decision "only if it is fully informed and well-considered"; conclusory statements regarding environmental impact or the lack thereof are insufficient.  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1023, 1028-1029 (9th Cir. 2007) (citation and internal quotation marks omitted).  Moreover, a court need not defer to agency's conclusions that are not supported by the administrative record or that run counter to the evidence before it.  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011).  Similarly, a court need not defer to an agency's expertise or experience "when the agency's decision is without substantial basis in fact."  *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 763-64, 766 (9th Cir. 2007).

## III.    Analysis

Plaintiffs challenge eight licenses for commercial grazing on allotments in Arizona's national forest.  As discussed, the Forest Service granted each of these licenses using the categorical exclusion in the Rider.  Plaintiffs challenge four only on the grounds that the licenses did not satisfy the forest-plan objectives condition, and three on the grounds that they did not satisfy the extraordinary-circumstance conditions.  Plaintiffs

7

challenge one allotment on both grounds.

## A. Challenges under only the forest-plan objectives condition

Plaintiffs assert that the licenses for four allotments—Pine Creek, Seven C-Bar, and Twin Tanks on the Kaibab National Forest, and V-Bar on the Prescott National Forest—fail to satisfy the forest-plan objectives condition. They contend that monitoring on these allotments does not indicate that grazing management is meeting or satisfactorily moving the allotments toward forest-plan objectives. If monitoring does not indicate that grazing management furthers the forest-plan objectives for a given allotment, then the Forest Service should not have used the categorical exclusion to issue the license.

### i. Pine Creek Allotment (Kaibab National Forest)

### 1. Kaibab National Forest LRMP

Developed in 1986 and amended repeatedly, the Kaibab National Forest's Land and Resource Management Plan provides guidance for the management of the forest. The forest-wide direction includes instructions to "[m]aintain soil productivity and watershed condition" and to "[r]ehabilitate non-productive lands on a planned basis to eliminate unsatisfactory watershed condition by 2020." (R. at PI001108.)[4] The forest plan also instructs personnel to "[m]anage the ground surface layer to maintain satisfactory soil conditions i.e. to minimize soil compaction . . . ." (R. at PI001109.) As guidance for determining whether land conditions are suitable, the forest plan provides that a "static or upward trend in range condition indicates a non-problem allotment. Conversely, a downward trend in range condition indicates a problem allotment." (R. at PI00209.)[5] It further directs the Forest Service to correct "[l]ess than satisfactory range conditions" using adjusted range management. (*Id.*) Finally, in line with the forest plan's express purpose of "balanc[ing] permitted grazing use with grazing capacity," the

---

[4] While these instructions are labeled in the Kaibab forest plan as "direction" rather than "objectives," they are culled from the Forest Service's Forest Plan Consistency Check for the Pine Creek Allotment in the record and therefore appear to represent the instructions the Forest Service had to comply with to satisfy the forest-plan objectives condition.

[5] Range condition is a "subjective expression of the status or health of the vegetation and soil relative to their combined potential to produce a sound and stable biotic community." (R. at PI000159.)

8

plan includes directions to "[p]roduce the maximum amount of forage consistent with other resource values, for use by wildlife and livestock on a sustained yield basis." (R. at PI001105, PI001107.)

### 2. The challenge to the Pine Creek decision

The Pine Creek Allotment consists of 8,374 acres in the Kaibab National Forest, on which the Forest Service reauthorized grazing in a Decision Memo dated September 26, 2008. Plaintiffs contend that monitoring indicates that both soil and vegetation conditions are worsening and thereby moving away from objectives in the forest plan. According to Plaintiffs, then, the categorical exclusion was not appropriate because the forest-plan objectives condition was not satisfied.

### 3. The Forest Service's decision was not arbitrary or capricious.

The Forest Service's determination that the grazing management was helping the Allotment meet or satisfactorily move toward forest-plan objectives was not arbitrary or capricious. With regard to soil conditions, the forest plan directs the Forest Service to maintain soil productivity and satisfactory soil conditions. (R. at PI001108-09.) The Decision Memo indicates that grazing management satisfied this directive for several reasons, among them that: (1) soil conditions at the five monitoring sites created in the 1950's have been "static or had an upward trend since being established" and have improved since 1983; and (2) while 21% of the Allotment was in unsatisfactory condition based on data collected between 1979 and 1986, range monitoring suggests that more land is probably in satisfactory condition now. (R. at PI001205.) Plaintiffs contend that bare soil, an undesirable condition, increased across monitoring sites between 1996 and 2007, belying the Forest Service's claim that the trend for soil conditions is upward. However, comparing data from 2007 to data from 1983 does suggest that bare soil percentages have decreased on the whole, (R. at PI001189), and the Forest Service has the discretion to rely on this data for its analysis, *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993) ("We defer to agency expertise on questions of methodology unless the agency has completely failed to address some [essential] factor

. . . .").  Moreover, the Forest Service has compared relatively recent data to data from the 1980s in order to evaluate long-term trends in other instances.  (*See, e.g.*, R. at PI001031 (discussing comparison of range-monitoring data from 2007 to 1985 data).)  While plant litter, a desirable layer of organic material that protects the soil, (*see* Doc. 33 at 23 n.9), has dropped at all monitoring sites since 1996, it has increased at all sites since 1983; again, the Forest Service can rationally determine that this longer-term trend shows movement toward forest-plan objectives.  Finally, Plaintiffs correctly note that the most recent quantification suggests that 21% of the Allotment's soil was in unsatisfactory condition.  Still, the Forest Service rationally determined that more of the soil is now satisfactory than was in 1983, based on broad improvements in soil conditions.

The Forest Service's determination that grazing management was moving the Allotment toward appropriate range conditions was likewise rational.  Range conditions have gotten worse since 1983, (R. at PI001160), and the Forest Service determined that the declining conditions were attributable in part to a drought that lasted from 1995 through 2005.  (R. at PI001159, PI001166.)  The Forest Service adapted grazing management to address some of the effects of that drought, for example by suspending commercial grazing on the Allotment from 2004 to 2007.  (*See* R. at PI001161, PI001203-04.)  Further, the Forest Service determined that such measures would in fact be effective in ameliorating the negative effects of the drought, presumably including the downward trend in range condition.  Since the Forest Service has some discretion in interpreting the Rider's forest-plan objectives condition, *see* FY 2005 Appropriations Act, Pub. L. No. 108-447 § 339 ("current grazing management is meeting, or satisfactorily moving toward, objectives . . . as determined by the Secretary"), the Forest Service can conclude that suspending grazing and taking other measures in order not to exacerbate range conditions satisfies the condition.  Thus, the Forest Service's decision does not reflect a "clear error of judgment."  *Marsh*, 490 U.S. at 378.  The poor range conditions on the Pine Creek Allotment do not render the Forest Service's use of the categorical exclusion arbitrary and capricious.

Finally, the Forest Service's decision serves not only the objectives related to soil and range conditions, but also the explicit forest-plan purpose of facilitating commercial grazing. The forest plan directs the Forest Service to "[p]roduce the maximum amount of forage" for wildlife and commercial grazing "consistent with other resource values." (R. at PI001107.) Such objectives concerning grazing are among those that must be met or approached under the Rider. The Forest Service's decision that grazing management was helping the Pine Creek Allotment meet or satisfactorily move toward forest-plan objectives was therefore not arbitrary or capricious.

### ii.  Seven C-Bar Allotment (Kaibab National Forest)

Located on the Williams Ranger District of the Kaibab National Forest, the Seven C-Bar Allotment covers 177 acres of land managed by the Forest Service. (R. at SE001153.) The district ranger's Decision Memo, dated September 26, 2008, authorized the grazing by up to twenty head of cattle for the period from July 1 to October 31, every other year. (*Id.*) The Forest Service manages the Seven C-Bar Allotment, like the Pine Creek Allotment, in accordance with the Kaibab National Forest LRMP.

### 1.  The challenge to the Seven C-Bar decision

As with the Pine Creek Allotment, Plaintiffs contend that range conditions on the Seven C-Bar Allotment are not moving toward the objectives laid out in the Kaibab forest plan. Plaintiffs rely on data from the only site on the Allotment that has been monitored since 1963: range conditions at that site improved between 1963 and 1984 but fell significantly between 1984 and 2007, when the range went from "Fair" to "Poor" or "Very Poor." (R. at SE001121; *see also* Doc. 58 at 10.) The Kaibab forest plan instructs the Forest Service to correct "[l]ess than satisfactory range conditions" through range management and specifies that a "downward trend in range condition indicates a problem allotment." (R. at PI000209.) Arguing that the Forest Service failed to comply with these directives and that grazing management is not furthering forest-plan objectives, Plaintiffs assert that that the Forest Service should not have issued a grazing license using the categorical exclusion.

11

1    **2. The Forest Service's decision was not arbitrary or capricious.**

2    The Range Specialist Report for the Seven C-Bar Allotment notes that the trend

3    for range condition has been "static or stable" since 1963 and "down" since 1984, (R. at

4    SE001117), and the Decision Memo reflects these conclusions, (R. at SE001154-55).

5    The Forest Service does not dispute that vegetation conditions and range conditions on

6    the Allotment declined between 1984 and 2007.  (Doc. 58 at 10.)

7    The Forest Service determined that at least some part of that decline was due to

8    the drought that began in 1996.  Defendant-Intervenors suggest that this ends the inquiry.

9    (*See* Doc. 41 at 28-29.)[6]  However, nothing in Congress' Rider suggests that the forest-

10   plan objectives condition does not apply when current grazing management is not the

11   complete cause, or even not any part of the cause, of the woes besetting an allotment.

12   The statutory language is not concerned with where the fault lies for land conditions that

13   do not comport with forest-plan objectives.  Instead, Congress' language in the Rider

14   looks only to whether current grazing management is somehow improving the situation.

15   Whether or not commercial grazing has caused or exacerbated poor conditions on the

16   land is irrelevant, and Defendant-Intervenors' arguments on that front—for Seven C-Bar

17   and other allotments—fail.

18   Nevertheless, the Forest Service's decision to use the categorical exclusion was

19   not arbitrary or capricious.  As with the Pine Creek Allotment, the Forest Service

20   followed the direction of the Kaibab forest plan and adjusted range management to try to

21   correct unsatisfactory conditions on the Allotment.  For example, between 1989 and

22   2008, grazing took place on the Allotment only during six years, and in only three of

23   those years was grazing at the full level authorized.  (R. at SE001117.)  As another

24   example, the Forest Service ensured that grazing did not exceed conservative levels

25   ──────────────
     [6] Defendant and Defendant-Intervenors also invoke the same argument—that the forest-
26   plan objectives condition does not apply when grazing management is not the cause of
     unsatisfactory soil, vegetation, or range conditions—for other allotments.  (*See, e.g.*, Doc.
27   58 at 16 (seeking dismissal of Plaintiffs' claims in part because "federal rangeland
     management did not cause the particular riparian and soil conditions about which plaintiff
28   complains").)  None of these arguments passes muster, as none follows from Congress'
     language in the Rider.

1  recommended in the "Resource Protection Measures" section of the Range Specialist
2  Report.  (R. at SE001127, SE001154.)  As was the case with the Pine Creek Allotment,
3  the Forest Service retains the discretion to determine that these adaptive management
4  measures suffice to satisfy the forest-plan objectives condition.  Especially in light of the
5  forest plan's emphasis on facilitating grazing when possible, the Forest Service's decision
6  to use the categorical exclusion was not arbitrary or capricious.

7  ### iii.  Twin Tanks Allotment (Kaibab National Forest)

8  The Twin Tanks Allotment covers 11,940 acres of land on the Kaibab National
9  Forest.  (R. at TW001224-25.)  On September 26, 2008, a Kaibab district ranger issued a
10  Decision Memo reauthorizing grazing on the Allotment.  (R. at TW001224-29.)  The
11  Decision Memo specifies that up to 1025 head of sheep could graze from May 21 through
12  October 20 and up to 30 head of rams could graze from June 11 to July 11. (R. at
13  TW001224.)  The guidance, objectives, and direction in the Kaibab National Forest Plan
14  apply to the Twin Tanks Allotment.

15  ### 1.  The challenge to the Twin Tanks decision

16  Plaintiffs contend that the forest-plan objectives condition of the Rider was not
17  satisfied; range conditions had allegedly declined, contravening the objectives set out in
18  the Kaibab forest plan, laid out *supra* at III(A)(i)(1).[7]  Plaintiffs specifically challenge the
19  Decision Memo's assertion that "[a]ll monitoring sites have either a static or upward
20  trend" with respect to vegetation and soil conditions.  (R. at TW001227.)  That
21  conclusion, along with others concerning range conditions, appears to underlie the district
22  ranger's determination that the decision is consistent with the current Kaibab forest plan.
23  Plaintiffs contend that this determination is arbitrary and capricious and that the license
24  should be set aside until the Forest Service has prepared an EIS or EA evaluating the
25  conditions at Twin Tanks.

26  ---
[7] The Kaibab National Forest LRMP seeks a condition in which "livestock grazing does
27  not impair important ecosystem functions, such as maintaining soil stability and
    productivity, and maintaining vegetation diversity and productivity."  (R. at TW001045.)
28  The forest plan also requires that the Forest Service manage grazing in a manner that
    rectifies any less-than-satisfactory range conditions.  (R. at PI000209.)

## 2.  The Twin Tanks Decision Memo

In the Decision Memo authorizing grazing on the Twin Tanks Allotment, the district ranger indicated that the Allotment satisfied the forest-plan objectives condition of the Rider, as evidenced by the static or upward trends in vegetation and soil conditions.  (R. at TW001226-28.)  First, the Decision Memo states that the "trend for Twin Tanks is generally static and stable for range and soil conditions since 1960" and similarly that "[a]ll monitoring sites have either a static or upward trend."  (R. at TW001227.)  These conclusions appear to be rooted in data from monitoring at one transect on the Allotment in 1960 and at twelve transects on the Allotment in 2007 and 2008.[8]  The Decision Memo highlights data from the Terrestrial Ecosystems Survey ("TES") and states that "[r]ange monitoring throughout the area shows soil condition have [sic] improved since the original surveys were completed, so today it is expected that the number of acres in satisfactory condition will be the same or better."  (*Id.*)  The Decision Memo then concludes that current grazing management is meeting or satisfactorily moving the Allotment toward forest-plan objectives.

Plaintiffs object to the characterization of range and soil conditions as having a "static or upward trend" at all monitored sites.  (Doc. 33 at 27.)  With respect to vegetation scores, seven of the eleven sites monitored in 2007—which did not include the site monitored in 1960—were rated "Poor" (with scores ranging from 27 to 38) and the remaining four sites were rated "Fair" (with scores ranging from 41 through 45).  (R. at TW001173, TW001176, TW001179, TW001182, TW001185, TW001188, TW001191, TW001194, TW001197, TW001200, TW001203.)  Moreover, each summary sheet provides a trend for vegetation conditions.  Five of the sites, including two that were already rated "Poor," showed a "Downward" trend, and six showed a "Static" trend.  (*Id.*)

---

[8] The record only includes information on the 2007 monitoring at eleven sites in the Twin Tanks Allotment.  (R. at TW001173-1205.)  The twelfth site, studied in 2008, was on the same location as the 1960 site.  (R. at TW001156.)  However, it appears that different analyses were conducted on this twelfth site in 1960 and in 2008.  (*Id.*)  The record is not clear as to how the 2008 findings at the twelfth site bore upon the Forest Service's conclusions regarding soil conditions.

1    Not one summary sheet for a site monitored in 2007 displays an "upward" trend for

2    vegetation conditions.  (*Id.*)  Plaintiffs also argue that monitoring in 2007 showed that

3    soil conditions were similarly of concern, with six sites showing a "Downward" trend.

4    Plaintiffs contend that the summary sheets do not support the conclusion of the Range

5    Specialist's Report, one of the reports underlying the Decision Memo, that soil conditions

6    were improving.

7          Defendant and Defendant-Intervenors explain that the "static or upward trend"

8    noted in the Decision Memo does in fact follow from a comparison of the monitored site

9    in 1960 to the eleven other sites monitored in 2007.  The site in 1960 had a vegetation

10   score of 23 and a soil condition score of 25 (both "Fair" ratings) (R. at TW001206);[9] all

11   eleven of the sites monitored in 2007 had higher scores for both vegetation and soil

12   conditions.  (R. at TW001173-1205.)  Moreover, while the 1960 site was not re-analyzed

13   in 2007, Defendant puts forth that it sufficed to have sites representative of the Allotment

14   studied and that the Forest Service checked to ensure that the 1960 site would be an

15   appropriate baseline for later monitoring.  (Doc. 58 at 12.)  Accordingly, Defendant and

16   Defendant-Intervenors contend that the Range Specialist's Report indicating a trend

17   "upward for soil condition" is correct and justifies the Decision Memo's conclusion

18   regarding static or improved range conditions.  Moreover, Defendant and Defendant-

19   Intervenors argue that the conflicting trend indicators on the summary sheets show only

20   current trends—the sheets do not themselves note whether they capture long- or short-

21   term trends—and that the long-term trend discussed in the Range Specialist's Report and

22   the Decision Memo provides the appropriate basis for decision-making.

23              **3.  The Forest Service's decision was not arbitrary or capricious.**

24         Given the evidence in the administrative record, the Forest Service's decision to

25   use the categorical exclusion to reauthorize the Twin Tanks grazing license was not

26   arbitrary and capricious.  First, while it arguably makes intuitive sense to give weight to

27   _____

28   [9] While the scores to which a rating (e.g., "Fair") corresponds appear to have changed
     since 1960, the record does not suggest that the way in which the Forest Service
     computes numerical scores for vegetation and soil conditions has altered.

the vegetation and soil trends recorded on the summary sheets, the Forest Service's explanation that these are current trends and that the long-term trends are more helpful in assessing range conditions is rational.  This is especially true given the Forest Service's emphasis on the long-term monitoring of range conditions.  (*See, e.g.*, R. at PI000209 (Kaibab National Forest LRMP authorizing range analysis every five to ten years depending on allotment conditions).)  Accordingly, the Forest Service's comparison of the 1960 and 2007 data provides a "reasonable basis" for its decision, which is consequently not arbitrary.  *See Indep. Acceptance Co.*, 204 F.3d at 1251 (citation omitted).  Further, even though only one site was evaluated in 1960 and eleven different sites were evaluated in 2007, it suffices that the Forest Service deemed the 2007 sites representative of the Allotment and comparable to the original site for monitoring purposes.  The Forest Service's decision to apply the categorical exclusion when issuing the Twin Tanks Allotment withstands scrutiny.

### iv.  V-Bar Allotment (Prescott National Forest)

The V-Bar Allotment consists of 20,736 acres of land in the Prescott National Forest.  (R. at VB000563.)  On September 28, 2007, a district ranger issued a ten-year permit allowing yearlong commercial grazing on the Allotment.  (R. at VB000564, VB000569.)  The Forest Service manages the V-Bar Allotment pursuant to the direction in the Prescott National Forest LRMP.

### 1.  Prescott National Forest LRMP

The Prescott National Forest LRMP offers a range of direction to the Forest Service.  The Forest Service is, as Plaintiffs discussed, instructed to "[p]rotect and improve the soil resource," "[i]mprove all riparian areas and maintain in satisfactory condition," and "[m]anage livestock grazing to achieve soil and water protection objectives."  (R. at VB000019-20, VB000038.)  The Forest Service must also "[p]rovide forage to grazing and browsing animals . . . without impairing land productivity."  (R. at VB000018.)

### 2.  The challenge to the V-Bar grazing license

The V-Bar Decision Memo notes that data from the Prescott National Forest Terrestrial Ecosystem Survey, the Arizona Department of Environmental Quality, the United States Geologic Survey, Soil Conditions inspections, and other sources indicate that "conditions on the allotment are meeting or moving toward the Forest Plan desired conditions." (R. at VB000565.)  Plaintiffs contend that the administrative record does not support this conclusion.  Instead, Plaintiffs argue that soil and riparian conditions have worsened under current grazing management, contravening forest-plan instructions to improve as necessary and protect soil resources, watersheds, and riparian areas. (Doc. 33 at 30-31.)  Specifically, Plaintiffs highlight that soils on 45% of the Allotment are "impaired" and that nine of fourteen sampling sites on the impaired areas had both less protective litter than is ideal and undesirable vegetation. (*Id.*)  Plaintiffs also emphasize that, of the fourteen sampling sites, six showed a downward trend in soil condition and only one showed an upward trend; the remaining sites showed no apparent trend. (*Id.* at 31.)  Further, even the areas with "satisfactory" soils had more (undesirable) bare ground than target levels, according to Plaintiffs, and bare ground and other impairments to the land had contributed to the degradation of riparian areas. (*Id.* at 31-33.)  Finally, Plaintiffs note that the Arizona Game and Fish Department had expressed concerns that: (1) livestock grazing was harming wildlife habitat and impairing land productivity; and (2) data regarding the pronghorn indicated that the Forest Service's management of the lands was not meeting objectives in the Prescott forest plan. (*Id.* at 32.)

### 3.  The Forest Service's decision was not arbitrary or capricious.

The Forest Service's determination that grazing management was satisfactorily moving the Allotment toward forest-plan objectives was not arbitrary or capricious. Plaintiffs' data on impaired soils derives from the Soil and Watershed Report, and that report specifies that impaired soils "do not preclude an area from grazing." (R. at VB000274.)  The percentage of soil that was impaired did not increase between 2000 and 2007, and sixteen of twenty-six sites evaluated in 2007 showed no trend or an upward

1   trend in soil conditions.  (R. at VB000274-77.)  The report does acknowledge "some

2   evidence that current management is contributing to decreased soil productivity" in

3   certain areas, but it also emphasizes that "continuing current adaptive management,

4   reacting to the impaired locations, and implement relevant [Best Management Practices]

5   will result in positive outcomes with reversal of lost productivity."  (R. at VB000278.)

6   Further, the report does document "overall deterioration" in riparian zones as a result of

7   "[i]mpaired upland conditions [that] are creating increased runoff," but it specifies that

8   the deteriorating stream areas are "not beyond the scope of improving under the current

9   adaptive management regime."  (*Id.*)  Finally, the Wildlife and Plant Specialist Report

10  details the effect of grazing on the pronghorn, a source of concern for the Arizona Game

11  and Fish Department; that report determined that there would be no impact on the amount

12  of pronghorn habitat or on pronghorn fawning.  (R. at VB000553.)  While the evidence

13  underlying the Forest Service's conclusion might seem sparse, a court cannot substitute

14  its judgment for that of an agency, and there is enough basis for the Forest Service's

15  decision regarding V-Bar that the decision is rational.

16      **B.  Challenges under the extraordinary-circumstances condition**

17          Plaintiffs contend that the licenses for the Casner Park/Kelly Seep, Cosnino, and

18  Angell Allotments do not satisfy the Rider's extraordinary-circumstances condition and

19  therefore that the Forest Service violated the Rider and NEPA by issuing the licenses

20  using the categorical exclusion.  If an allotment was home to a resource condition listed

21  in the Forest Service's policy on extraordinary circumstances, and if the proposed grazing

22  could have had a significant effect on the resource condition, then the use of the

23  categorical exclusion was inappropriate.   The Forest Service was charged with

24  determining whether such a causal effect could exist and the extent of the effect, if any.

25  If the Forest Service failed to do so or was uncertain as to whether the proposed action

26  would have a significant effect on the resource condition, then the Forest Service should

27  have prepared an EA for the grazing license in question.

28

### i.  Casner Park/Kelly Seep Allotment (Coconino National Forest)

The Casner Park/Kelly Seep Allotment consists of 28,980 acres of land in the Mormon Lake Ranger District of the Coconino National Forest.  On September 26, 2008, the district ranger issued by way of the categorical exclusion a commercial grazing license for 395 head of yearling cattle from June 1 through October 31.  (R. at CA001386, CA001391.)   The Decision Memo acknowledges the presence of critical habitat for the Mexican spotted owl, a threatened species, on the Allotment.  (R. at CA001389.)   In order to protect the spotted owl, the Forest Service adopted a new adaptive management program in its 2008 Annual Operating Instructions for pastures on the Casner Park/Kelly Seep Allotment and implemented a monitoring plan.  (R. at CA001291-97, CA001386-87.)   Plaintiffs object to the idea that the monitoring plan designed to protect the Mexican spotted owl and its habitat will only happen "as funding is available."  (R. at CA001387.)   Plaintiffs contend that since funding may not be available, there can be no certainty as to whether grazing will significantly affect the threatened species, and accordingly that there is an extraordinary circumstance that precludes the use of the categorical exclusion.[10]  Defendant and Defendant-Intervenors assert that the license satisfies the extraordinary-circumstance condition, as well as the other requirements of the categorical exclusion, and should accordingly be upheld.

The Forest Service did not act arbitrarily or capriciously in deciding that there was no extraordinary circumstance—the categorical exclusion was applicable to the Casner Park/Kelly Seep license.  First, a comprehensive and multi-faceted monitoring system designed to protect the Mexican spotted owl will be in place as long as there is funding. This includes annual monitoring of permittee compliance, forage production, utilization, and canopy cover, long-term trend monitoring of ground cover, species composition, and other indicators.  (R. at CA001387; *see also* R. at CA001328.)  While there is no absolute guarantee of funding, the Forest Service can reasonably assume that monitoring will

---

[10] Plaintiffs clarified during oral argument that they were not arguing that the Casner Park/Kelly Seek license failed to satisfy the forest-plan objectives condition of the categorical exclusion.

1   proceed as detailed in the Decision Memo and the underlying reports, as the Coconino

2   forest plan includes provisions regarding monitoring and is the basis for budget requests.

3   (*See* R. at CA000260.)[11]  Should this scenario bear out, even Plaintiffs do not suggest that

4   there will be any extraordinary circumstance.  Second, even if the Forest Service is

5   unable to fund its full slate of monitoring, it has made provisions to monitor in

6   conjunction with the grazing licensee to ensure that the Allotment—and the Mexican

7   spotted owl—is protected.  (*See, e.g.*, R. at CA001293.)

8       Third, the Forest Service's "certainty" with respect to whether its actions

9   significantly affect a threatened species must be considered in the context of broader

10  Forest Service policy.  The plain text of the Forest Service's policy on extraordinary

11  circumstances does require that the district ranger be certain that the proposed action will

12  have no significant effect on a resource condition before the categorical exclusion can be

13  used.  *See* FSH, 1909.15, §§ 31.2-31.3 (2010).  That policy, however, cannot be

14  considered in isolation.  That policy and all other agency policies must be considered in

15  the context of limited resources: no agency has an unlimited budget, and Congress, not

16  the agency itself, controls funding.  The Coconino forest plan, which provides the

17  primary guidance for the Forest Service in its management of the Coconino National

18  Forest, recognizes repeatedly that budget limitations may affect forest planning and

19  management.  (*See, e.g.*, R. at CA000629 (Coconino LRMP noting "[a]s the budget

20  proposals move through the Administration . . . some adjustments are likely. . . .  Specific

21  budget proposals are likely to change when the annual allocation of funding is received at

22  the Forest level."); R. at CA000283 (Coconino LRMP stating that "[f]unding levels may

23  require adjustment of priorities.").)  Therefore, the "certainty" requirement of the

24  extraordinary-circumstance policy should be read in light of these potential budget

25  constraints.  It is, in effect, certainty to the extent possible, given available funding and

26  information.  The Forest Service has met this bar.

---

27  [11] Defendant also indicated in oral argument that congressional budget allocations have
28  never failed to cover the type of monitoring planned for the Casner Park/Kelly Seep
    Allotment.

Finally, the record evinces no other indication that grazing will have a significant impact on the Mexican spotted owl.  The record in fact includes evidence that grazing will not significantly impact the owl.  (*See, e.g.*, R. at CA001346 (inspection of Mexican spotted owl habitat on Allotment in 2007 revealed "little to no evidence of grazing" in protected areas); R. at CA001389 (Decision Memo noting that most of the protected habitat is "steep . . . with high canopy cover restricting understory growth and is rarely used by livestock").)  For the foregoing reasons, the Forest Service did not act arbitrarily or capriciously in determining that the Casner Park/Kelly Seep grazing license satisfied the extraordinary-circumstance condition of the Rider.

### ii.  Cosnino Allotment (Coconino National Forest)

The Cosnino Allotment includes 10,871 acres in the Peaks Ranger District of Coconino National Forest.  (R. at CO001265.)  On September 26, 2008, a district ranger reauthorized grazing on the Allotment for up to 160 head of cattle for the period from June 1 through October 31.  (R. at CO001319, CO001323.)  As with the Casner Park/Kelly Seep Allotment, Plaintiffs challenge the Cosnino grazing license on the basis that funding for monitoring is not guaranteed and that the Forest Service has not adopted a backup plan.  (Doc. 33 at 21.)

The Forest Service had several rational bases for determining that the Cosnino license satisfies the extraordinary-circumstance condition.  First, Plaintiffs have not specifically identified a resource condition enumerated by the Forest Service Handbook that, if affected by grazing, could rise to the level of an extraordinary circumstance.  If no such resource condition is present, the Forest Service's extraordinary-circumstance policy and the Rider's extraordinary-circumstance condition are not implicated.  Second, as with the Casner Park/Kelly Seep Allotment, a monitoring scheme is in place and will proceed as long as funding is available, and at least some monitoring will be conducted by the grazing permittee even if the Forest Service does not have funding.  (R. at CO001222-23, CO001270, CO001320.)  The potential lack of future monitoring, then, cannot give rise to an extraordinary circumstance that renders the categorical exclusion inapplicable.

21

1    Finally, as discussed earlier, the certainty required to comply with the conditions of the

2    categorical exclusion is only certainty to the extent possible given the budget provided to

3    the Forest Service by Congress.  Plaintiffs' challenge to the Cosnino license under the

4    extraordinary-circumstance provision thus fails.[12]

5              **iii.  Angell Allotment (Coconino National Forest)**

6         Next, Plaintiffs challenge the Angell Allotment grazing license as violative of the

7    extraordinary-circumstance condition of the Rider.  The Angell Allotment consists of

8    51,696 acres of land in the in the Peaks Ranger District of the Coconino National

9    Forest.  (R. at AN001662.)  On July 31, 2006, a district ranger authored a Decision

10   Memo issuing a term grazing permit for up to 425 cattle for May 15 through October

11   31.  (R. at AN001662.)  Plaintiffs contend that the Forest Service failed to properly

12   analyze whether the archaeological and Native American sites on the Allotment

13   constitute an extraordinary circumstance.  They further assert that the Forest Service did

14   not determine whether the proposed license could have a significant effect on the sites,

15   even though they are a resource condition identified for protection in the Forest

16   Service's extraordinary-circumstance policy.  Therefore, according to Plaintiffs, the

17   Forest Service did not comply with the extraordinary-circumstance condition of the

18   Rider and should not have applied the categorical exclusion in this case.  Consequently,

19   Plaintiffs argue that the Forest Service acted arbitrarily and capriciously in issuing the

20   permit without having prepared an EIS or an EA and request that the grazing license be

21   set aside until the Forest Service engages in more extensive environmental review.

22
23   [12]  Plaintiffs may also be challenging the Cosnino license on the grounds that its
     conditional funding of monitoring fails to satisfy the forest-plan objectives condition.
24   However, the forest-plan objectives condition by its text addresses past and current
     monitoring; Plaintiffs' contention instead raises the possibility that future monitoring
25   might not occur as recommended by the reports underlying the Decision Memo.  (Doc.
     33 at 19-20.)  As such, the fact that monitoring will only occur as funding is available
26   does not violate the second condition of the Rider.  Further, the Decision Memo provides
     adequate support for its conclusion that the forest-plan objectives condition is satisfied.
27   (R. at CO001321.)  And, while the Soil and Water Specialist's Report asserts that "[t]here
     is a need for change from the current management as the allotment is not meeting or
28   moving toward desired conditions in an acceptable timeframe," the data in the report does
     not support this determination.  (R. at CO001191.)

22

1

2              **1.  Archaeological sites on the Angell Allotment**

3         The Angell Allotment features a striking array and density of archaeological

4    sites—"a system of settlements"—mostly dating from 8000 B.C. to 1300 A.D.  (R. at

5    AN001641.)   While archaeologists have only surveyed 4% of the land within the

6    Allotment, they have identified 777 sites, including artifact scatters, field houses, pit

7    houses, pueblo settlements, ceremonial complexes, Navajo sites, and more.  (R. at

8    AN001640-42.)  Of these 777 sites, 698 are eligible for the National Register of Historic

9    Places (the "Register"), 39 are already listed on the Register, and one, a Sinagua

10   pithouse village dating from around 1100 A.D., is a National Historic Landmark.  (R. at

11   AN001643.)   Other particularly notable sites on the Allotment include a 34-room

12   pueblo, a 3-room pueblo fort, and Kiva sites.  Further, archaeologists categorize the

13   entire Angell Allotment as having a moderate to high site density (37 to 59 sites per

14   square mile) throughout most of the project area; they note that sites tend to cluster

15   around springs and in canyons in the Allotment's pinyon-juniper vegetation zone,

16   contributing to a higher density of sites in some regions of the Allotment.  (R. at

17   AN001640-41.)

18             **2.  The Forest Service's consideration of archaeological sites**

19        In the Decision Memo reauthorizing the Angell grazing license, the district ranger

20   included two sentences addressing the archaeological findings and Native American

21   areas on the Allotment: "13 Native American tribes have been consulted on this project

22   and none of them have [sic] expressed concern to date.  An archaeological survey and

23   clearance report was completed for this project and no effects to archaeological

24   resources or sites are anticipated."  (R. at AN001666.)  The underlying Archaeological

25   Survey and Cultural Resources Clearance Report (the "Archaeological Survey") hails

26   the long history of permit-based livestock grazing on the forest.  (R. at AN001643.)  It

27   then declares as follows:

28

23

1

2

3

4

> wild ungulates[13] have ranged free, potentially in substantial numbers, throughout time; effects to cultural resources have occurred as a result of this situation and are considered *status quo*, or the existing situation.  Management of livestock under this management plan will result in no effect, as it continues the *status quo*.

5

6

7

8

9

10

(R. at AN001643.)  The report also lists the Native American tribes that were "notified of the project" and makes recommendations for the protection of archaeological sites that have already been discovered and for future monitoring of cultural resources.  (R. at AN001643-44.)  On that basis, the district ranger in the Decision Memo stated that no extraordinary circumstance was present on the Allotment.  (R. at AN001665-66; *see also* R. at AN001639.)

11

12

13

14

15

16

17

18

19

The only on-the-ground analysis of the situation, not mentioned in the Decision Memo but addressed in the Archaeological Survey, was an "intensive" survey of 4% of the Allotment's land for cultural resources such as archaeological and Native American sites.  (R. at AN001640.)  At oral argument, Plaintiffs' counsel indicated that the survey was conducted as a general inventory of resources pursuant to the Coconino forest plan, not specifically for and not tailored to any grazing analysis.  In that small sample alone, 777 sites were identified.  (*Id.*)  Nothing was done to catalog sites across the rest of the Allotment, which surveyors categorized as having moderate to high site density of archaeological and Native American sites.  (*See id.*)

20

21

22

23

24

Finally, the Archaeological Survey recommended management practices "[i]n order to ensure" that the "management of livestock . . . will result in no effect."  Those management practices ranged from monitoring and controlling the locations of grazing-related activities to requiring "cultural resources clearance" before undertaking new projects.  (R. at AN001639, AN001643-44.)

25

### 3.  The Forest Service's decision was arbitrary and capricious.

26

27

28

Given the evidence in the administrative record, the Forest Service did not adequately assess whether the proposed Angell grazing license satisfied the

---

[13] An "ungulate" is a hoofed mammal that may be wild or domesticated.

1 extraordinary-circumstance condition of the Rider.  Congress' categorical exclusion

2 greatly streamlined the process by which the Forest Service could issue grazing licenses,

3 but Congress did not give the agency authority to distribute the licenses at will.  The

4 Forest Service still must ascertain that certain conditions, including the extraordinary-

5 condition condition of the Rider, are first met.  For the reasons set forth below, the Forest

6 Service failed to do so before reauthorizing the Angell grazing license, and its decision to

7 issue to the license using the categorical exclusion was arbitrary and capricious.

8        Defendant-Intervenors argue that the long history of grazing on the Allotment

9 means that any effect it has on cultural resources cannot be "extraordinary," and therefore

10 that no extraordinary circumstance is present.  (Doc. 41 at 18.)  This analysis ignores the

11 regulatory language in the Forest Service Handbook; "extraordinary circumstances" arise

12 not only when new or unusual activities are proposed, but when a proposed action may

13 have a significant effect on an enumerated resource condition, such as archaeological

14 sites.  FSH, 1909.15 § 31.2 (2010).

15        As discussed *supra* at I(A), Congress has declared that its categorical exclusion

16 can only apply if issuing a grazing license is consistent with the Forest Service's policy

17 on extraordinary circumstances.  FY 2005 Appropriations Act, Pub. L. No. 108-447 §

18 339.  The Forest Service's policy on extraordinary circumstances specifies that the

19 presence of certain resource conditions, among them American Indian religious or

20 cultural sites and archaeological sites, may mean that a categorical exclusion is

21 inappropriate.  36 C.F.R § 220.6(b)(1); *see also* FSH, 1909.15 § 31.2 (2010).  The Forest

22 Service is to determine whether and to what degree the proposed action, reauthorizing

23 commercial grazing, would affect the resource condition, the archaeological and Native

24 American sites.  If there is uncertainty about the degree to which the proposed action

25 would affect the resource condition—if there is uncertainty as to the significance of the

26 effect—"then an extraordinary circumstance exists, precluding use of a categorical

27 exclusion." FSH, 1909.15 § 31.2 (2010).  In other words, unless the responsible officer is

28 certain (to the extent possible, given budget constraints) that the proposed action will not

1    have a significant effect on the resource condition, the categorical exclusion is

2    inappropriate.

3        Here, the district ranger did not follow Forest Service policy before concluding

4    that no extraordinary circumstance existed.  The record indicates that the conclusion was

5    based on statements proffered in the Archaeological Survey (and repeated in the Angell

6    Grazing Allotment Management Plan), including that "wild ungulates have ranged free,

7    potentially in substantial numbers, throughout time; effects to cultural resources have

8    occurred as a result of this situation and are considered *status quo* . . . ."  (R. at

9    AN001643, AN001639.)  The report's comment that "effects to cultural resources have

10   occurred" indicates that the authors recognized that grazing by wild ungulates has

11   affected archaeological and Native American sites, presumably through trampling and

12   possibly in other ways.  The Survey continues that "[m]anagement of livestock . . . [will]

13   continue[] the *status quo*[,]" (R. at AN001643), suggesting that livestock have some

14   impact on archaeological sites comparable to that caused by wild ungulates.  Absent

15   evidence to the contrary, it then appears that commercial grazing affects cultural

16   resources.

17       Defendant argues that Plaintiffs have not pointed to any evidence in the record that

18   suggests that the Forest Service determined that grazing can affect cultural resources.

19   (Doc. 58 at 2-3.)  The language of the Archaeological Survey declaring the effects of

20   wild ungulates—and therefore the effects of livestock—to be status quo belies this

21   assertion.  Further, the likelihood that commercial grazing will affect cultural resources is

22   increased because cattle congregate near water, as did settlers (*see* R. at AN001641);

23   grazing then appears to occur near places where cultural resources are located.  *See W.*

24   *Watersheds*, 2012 WL 1094356, at *14 (noting that grazing and recreational use, a

25   resource condition, both occur mainly near high-elevation meadows and lakes).  This

26   reinforces the Forest Service's obligations to explain why and how grazing will not affect

27   the resource condition.  *See id.* (stating that since grazing occurred in same area as

28   recreational use, Forest Service acted arbitrarily when it used categorical exclusion

1   without explaining why usage conflict did not adversely affect resource condition).

2   Since grazing appears likely to affect the cultural resources, the Forest Service's

3   extraordinary-circumstance policy demanded that the Forest Service determine whether

4   the effect of grazing would be significant.  *See* FSH, 1909.15 § 31.2 (2010).  In order to

5   employ the categorical exclusion, the Forest Service must not only rationally conclude

6   that the effect of grazing on the cultural resources will not be significant, but must be

7   certain to the extent possible, given budget constraints, that such is the case.  The Forest

8   Service here fell short of this requirement.  Instead of attempting to measure or calculate

9   the effect of grazing to determine its potential significance, the Forest Service, in the

10   Archaeological Survey underlying the Decision Memo, summarily dismissed the effect of

11   grazing as "the status quo" and therefore the equivalent of "no effect."  (R. at

12   AN001643.)[14]  The Forest Service did not try to determine the extent of effects caused by

13   wild ungulates, whether grazing would lead to effects of similar magnitude, or anything

14   of the sort.  Defendant contends that "nothing in the administrative record suggests that

15   the Forest Service was 'uncertain'" about its determination that any potential effect of

16   grazing was not significant, (Doc. 43 at 17), but in fact nothing in the administrative

17   record hints that the Forest Service made any reasoned determination on the issue.[15]  The

18   Forest Service failed to comply with its own extraordinary-circumstance policy.  It made

19   no effort to determine whether grazing would have a significant effect on archaeological

20   and Native American resources.  The Forest Service did not conduct sufficient analysis or

21   offer adequate reasoning to support any conclusion at all, let alone one that no significant

22

23   [14] The false equivalency in the Archaeological Survey between "status quo" effects and
24   "no effect" suggests that the Forest Service was considering the wrong underlying
     question.  Instead of looking at whether continuing grazing could have a significant, or
     any, effect on resource conditions when compared to the potential effect of no
25   commercial grazing, the Forest Service appears to have been looking at the difference in
     effects between continued grazing and grazing in the past.
26   [15] Sampling is appropriate under certain circumstances.  (*See* R. at AN000585 (Coconino
     forest plan noting circumstances under which sampling is appropriate, including "low
27   expected archaeological density" and "types of archaeological sites present").)  However,
     even if sampling were appropriate given the circumstances on the Angell Allotment, the
28   Forest Service was still required to analyze the potential significance of the effect of
     continued grazing on cultural resources, which it failed to do.

1   effect would occur.  It failed to conduct any analysis that could possibly allow it to be

2   certain, as required by the Forest Service policy, that no significant effect would occur.

3          In disregarding its own policies and failing to measure the potential significance of

4   the effect of grazing, the Forest Service "entirely failed to consider an important aspect of

5   the problem."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

6   43 (1983).  Its conclusory statements declaring that no significant effect on resources

7   would occur, and therefore that no extraordinary circumstance was present, lack

8   underlying analysis or justification and consequently are insufficient.  *Sierra Club v.*

9   *Bosworth*, 510 F.3d 1016, 1023, 1028-29 (9th Cir. 2007).  Conclusions untethered to any

10  analysis do not merit deference.  *Id.*  As such, the Forest Service failed to determine

11  whether the Angell Allotment grazing license complied with its own extraordinary-

12  circumstance policy and thereby violated the Rider when it invoked the categorical

13  exclusion.

14         The Forest Service tried to ameliorate its failure to conform to policy by

15  highlighting the protective measures the Archaeological Survey recommended to help

16  ensure that grazing would not affect cultural resources.  The measures include: (1)

17  precluding ground-disturbing livestock activities at 79 archaeological sites, (2) focusing

18  grazing activities "away from cultural resources," (3) obtaining "cultural resources

19  clearance" before starting new activities, and (4) monitoring "known archaeological

20  sites."  (R. at AN001639, AN001643-44.)  Defendant suggests that this satisfies the

21  Rider.  Indeed, "the use of mitigation measures, or adaptive management, is a well

22  recognized and permissible tool" for addressing the potential impact of Forest Service

23  actions. *W. Watersheds*, 2012 WL 1094356, at *15 (citing *Theodore Roosevelt Conserv.*

24  *P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010)).  Attempts at mitigation, however,

25  do not undercut the fact that the Forest Service ignored its mandate.  "[D]efendant

26  overlooks the corollary principle that such mitigation measures, even if necessary, 'are

27  not alone sufficient to meet []NEPA obligations to determine the projected extent of the

28  environmental harm to enumerated resources *before* a project is approved.'"  *Id.*

28

(determining in a categorical-exclusion grazing-license case that mitigation measures did not satisfy the Rider when the Forest Service did not adequately explain why a specific extraordinary circumstance did not exist) (quoting *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011)).  The Forest Service cannot overlook the requirements of its extraordinary-circumstance policy and then turn to protective measures for cover.

Furthermore, several of the protective and management mechanisms proffered are not likely to do much to protect archaeological and Native American resources potentially at risk.  Only 4% of the Allotment's land was surveyed.  (R. at AN001640.) However, three of the four recommended management practices—(1) monitoring "known" sites, (2) prohibiting the disturbance at 79 sites on the surveyed land, and (3) concentrating grazing away from (presumably known) cultural resources—focus on sites on that surveyed land.  They do nothing to protect the cultural resources of the remaining 96% of the Allotment from potentially significant harm.  Moreover, as Plaintiffs noted, the value of monitoring is dubious: monitoring a centuries-old clay pot while it is being trampled by cattle hardly protects that pot.[16]  Accordingly, the Forest Service's decision to implement protective measures, laudable though it may be, does not cure its failure to satisfy the terms of its extraordinary-circumstance policy and the Rider's extraordinary-circumstance condition.

In sum, the Forest Service acted inconsistently with its extraordinary-circumstance policy: after indicating that commercial grazing may affect resource conditions, the Forest Service did not rationally conclude that any effect would not be significant.  The Forest Service thereby violated the Rider in renewing the Angell Allotment grazing license using the categorical exclusion.  Its decision to apply the categorical exclusion in the case of the Angell Allotment was arbitrary and capricious.

---

[16] Of course, monitoring can help if grazing management is adapted in response to the data culled from monitored locations.  However, it does little to stop any immediate and potentially significant effect of commercial grazing on cultural resources.

29

1

2
3

### C. Challenge to Chino Valley Allotment decision under both the forest-plan objectives and extraordinary-circumstance provisions

4       Situated in the Prescott National Forest, the Chino Valley Allotment covers

5   approximately 3,382 acres of national forest land.  On September 28, 2007, the Chino

6   Valley District Ranger issued a Decision Memo reauthorizing commercial grazing on the

7   Allotment for the period from November 1 through May 31 through a ten-year permit.

8   (R. at CH000349, CH000350.)

9                 ### i.  The challenge under the forest-plan objectives condition fails.

10      Plaintiffs challenge the decision to issue the Chino Valley grazing permit as

11  arbitrary because monitoring allegedly does not indicate that current management is

12  moving the Allotment toward forest-plan objectives.  Plaintiffs assert that nearly half of

13  the soil in the Allotment is in impaired condition and that current grazing management is

14  contributing to declining soil conditions.   According to Plaintiffs, current grazing

15  management is moving the Allotment away from key forest-plan objectives, including

16  but not limited to forest-plan instructions to "[p]rotect and improve the soil resource" and

17  "[r]estore all lands to satisfactory watershed conditions."  (R. at CH000302.)

18      The record supports the Forest Service's determination, as conveyed in the

19  Decision Memo, that the Chino Valley Allotment satisfies the forest-plan objectives

20  condition.  The Allotment's 2007 Soil Resource Report provides data from a 2000 survey

21  in which soil on 46% of the Allotment was in satisfactory condition, 53% was impaired,

22  and 1% was unsatisfactory.  (R. at CH000300.)  A 2007 study of seven sites within two

23  areas of the Allotment used for grazing showed that four of seven sites had satisfactory

24  soil conditions and that one of the three impaired sites exhibited an upward trend in soil

25  conditions.  (R. at CH000300-01.)  The Soil Resource Report concluded that "there [was]

26  evidence that current management [was] contributing to decreased soil productivity in . . .

27  31% of the allotment" but that "sufficient recovery will occur with an adaptive

28  management regime" and that "continuing current adaptive management . . . will result in

1    positive outcomes with reversal of lost productivity."  (R. at CH000301.)   Adaptive

2    management, in which the Forest Service has the authority to alter grazing practices as

3    environmental and other concerns so require, is part of the current grazing management

4    scheme; for example, no grazing occurred in 2002 and 2004 in order to protect

5    environmental resources.  (R. at CH000251.)  The Decision Memo specifies that it will

6    incorporate adaptive management practices that provide flexibility with regard to the

7    duration, timing, and frequency of grazing, thereby allowing "plant, soil, and watershed

8    conditions to be maintained or improved . . . ."  (R. at CH000351.)  Those practices are

9    designated in the Annual Operating Instructions for the Chino Valley Allotment.  (*Id.*)

10   Given that the Decision Memo provides for adaptive management and that monitoring

11   suggests that adaptive management can improve soil conditions, the Forest Service's

12   determination that Chino Valley satisfies the forest-plan objectives condition is not

13   arbitrary or capricious.

14         Further, to the extent that Plaintiffs question the methodology adopted by the

15   Forest Service to evaluate soil conditions, Plaintiffs' challenge fails.  Courts afford

16   agencies a great deal of deference with regard to issues of methodology that implicate

17   agency expertise.  *See, e.g.*, *Schultz*, 992 F.2d at 981 (noting that courts "will not second-

18   guess methodological choices made by an agency in its area of expertise" unless the

19   agency has failed to consider some factor in its analysis).  Here, the administrative record

20   indicates that the Forest Service used its standard methodology to select and analyze sites

21   for its 2007 study and that it chose which areas to examine based on their size and

22   whether they were accessible by cattle.  (R. at CH000299.)  In particular, all sites selected

23   showed evidence of past or current grazing.  (*Id.*)  The choice of this sampling

24   methodology is not arbitrary and capricious.

25              **ii.  The challenge under the extraordinary-circumstance condition also
               fails.**

26
        Plaintiffs assert that the Chino Valley Allotment does not satisfy the Rider's
27
     extraordinary-circumstance provision, but they do not specify what enumerated resource
28

31

1   condition may be significantly affected by grazing.  The Decision Memo rationally finds,

2   based on the Wildlife Specialist Report and Biological Assessment and Evaluation, the

3   Soil Resource report, and other documents, that no extraordinary circumstance exists.  (R.

4   at CH000351-52.)   The record itself does not indicate the presence of any resource

5   condition that could be threatened by grazing.  The Allotment satisfies the extraordinary-

6   circumstance condition and, as discussed previously, the forest-plan objectives condition.

7   Accordingly, the Forest Service did not act arbitrarily or capriciously in issuing the Chino

8   Valley grazing license pursuant to the categorical exclusion.

9   **IV.    Conclusion**

10          Congress has charged the Forest Service with balancing the protection of

11  environmental and cultural resources with the use of the land for such purposes as

12  commercial grazing.  Congress has further sought to streamline the processing of grazing

13  permits, by allowing the Forest Service to reauthorize permits pursuant to certain

14  conditions without extensive environmental review.   As courts review these Forest

15  Service decisions using a particularly deferential standard, seven of the eight Forest

16  Service decisions pass muster.  Given its failure to conduct the requisite analysis for the

17  Angell Allotment, however, the Forest Service acted arbitrarily in issuing that grazing

18  permit.

19          IT IS THEREFORE ORDERED DENYING Plaintiff's Motion for Summary

20  Judgment (Doc. 33), GRANTING Defendant's Cross-Motion for Summary Judgment

21  (Doc. 34), and GRANTING Defendant-Intervenors' Motion for Summary Judgment

22  (Doc. 35) with respect to commercial grazing on the following allotments: (1) Casner

23  Park/Kelly Seep, (2) Pine Creek, (3) Seven C-Bar, (4) Twin Tanks, (5) Chino Valley, (6)

24  Cosnino, and (7) V-Bar.

25          IT IS FURTHER ORDERED GRANTING Plaintiff's Motion for Summary

26  Judgment (Doc. 33), DENYING Defendant's Cross-Motion for Summary Judgment

27  (Doc. 34), and DENYING Defendant-Intervenors' Motion for Summary Judgment (Doc.

28  35) with respect to commercial grazing on the Angell Allotment.

IT IS FURTHER ORDERED that the parties confer and submit by January 8, 2013, a joint proposed form of judgment or, if the parties cannot agree, separate proposed forms of judgment and separate memoranda addressing the differences between the proposed forms of judgment.

Dated this 17th day of December, 2012.

Neil V. Wake
United States District Judge